STATE OF NORTH CAROLINA v. EVERETT RANDOLPH HUFF

No. 372A87

(Filed 26 July 1989)

1. **Criminal Law § 92.4— consolidation of murder charges against defendant—transactional connection**

   There was sufficient evidence of a transactional connection to support the trial court's joinder of two first degree murder charges against defendant for trial where the evidence tended to show that defendant buried his infant son during the day and shot his mother-in-law before she had retired that same night, and that both killings resulted from defendant's common plan to resolve problems created by his perception that divorce from his wife was inevitable and that his son would be placed in the wife's custody and continuously exposed to the wife's family whom he viewed as perverted.

   **Am Jur 2d, Criminal Law §§ 20, 21.**

2. **Criminal Law § 92.4— consolidation of murder charges against defendant—defenses not hindered**

   The joinder for trial of charges against defendant for the first degree murder of his infant son and first degree murder of his mother-in-law did not hinder defendant's ability to present his defenses. There was no danger that the jury cumulated

1

the evidence of premeditation and deliberation in the two cases in order to convict him of the first degree murder of his mother-in-law where there was ample evidence of premeditation and deliberation in both cases. Nor did the consolidation force defendant into presenting in the same trial conflicting defenses of insanity as to the murder of his son and lack of premeditation and deliberation as to the murder of his mother-in-law where the evidence shows that defendant presented both defenses to both charges, and that defendant's experts offered substantial evidence which tended to establish insanity and that defendant's ability to premeditate and deliberate was impaired.

**Am Jur 2d, Criminal Law §§ 20, 21.**

3. **Constitutional Law § 66; Criminal Law § 98— capital case—accused's right to be present at trial—waiver not permitted**

The accused cannot waive the right to be present at a capital trial, and the court has a duty to insure defendant's presence throughout the trial.

**Am Jur 2d, Criminal Law §§ 692, 693, 698.**

4. **Constitutional Law § 66; Criminal Law § 98— capital case—accused's right to be present at trial—confrontation clause**

The confrontation clause of Art. I, § 23 of the N. C. Constitution is the sole source of a criminal defendant's nonwaivable state right to be present at every stage of his capital trial and of the corollary duty imposed on the trial court to insure his presence.

**Am Jur 2d, Criminal Law §§ 698, 721.**

5. **Constitutional Law § 66; Criminal Law § 98— capital case—violation of accused's right to be present—harmless error rule**

The proper standard for reversal in reviewing violations of a defendant's state constitutional right to be present at all stages of his capital trial is the "harmless beyond a reasonable doubt" standard. Therefore, a new trial will be awarded for such a violation unless the State proves that the error was harmless beyond a reasonable doubt. Insofar as prior decisions and language in our case law are inconsistent with this opinion, they are overruled.

**Am Jur 2d, New Trial § 103.**

STATE v. HUFF

[325 N.C. 1 (1989)]

6. **Constitutional Law § 66; Criminal Law § 98 — capital trial — violation of accused's right to be present — harmless error**

The trial court erred in permitting defendant to be absent during part of the presentation of the prosecution's evidence in defendant's capital case, but such error was harmless beyond a reasonable doubt where the record shows that defendant became distressed while a detective was reading his confession in which he admitted that he killed his son and his mother-in-law; the trial court excused defendant from the courtroom at the request of defendant and defense counsel after an attempt was made to calm defendant during a recess; defendant remained out of the courtroom during the remainder of the detective's testimony and during a medical examiner's testimony concerning an autopsy on defendant's son; the trial court carefully informed the jury in open court that defendant was absent at his own request and at the request of his attorneys; the court reporter was present and transcribed the events which occurred during defendant's absence; defendant's attorneys were in court and participated throughout defendant's absence to protect his interests; and the trial judge told counsel that they could confer with defendant as to the possibility of his return at any time and that he would entertain their request to allow defendant to return at any time.

**Am Jur 2d, Criminal Law § 700.**

7. **Constitutional Law § 74; Criminal Law § 5.1 — insanity defense — expert testimony — rebuttal by State — evidence from court-ordered psychiatric examination — no violation of right against self-incrimination**

When a defendant relies on the insanity defense and introduces expert testimony on his mental status, the prosecution may introduce expert testimony derived from prior court-ordered psychiatric examinations for the purpose of rebutting that testimony without violating defendant's right to be free from compelled self-incrimination under the Fifth Amendment to the U. S. Constitution and Art. I, § 23 of the N. C. Constitution. Judicial balance and fundamental fairness require that the State have an opportunity to rebut defendant's psychiatric testimony with psychiatric testimony of its own.

**Am Jur 2d, Criminal Law § 79.**

STATE v. HUFF

[325 N.C. 1 (1989)]

8. **Criminal Law § 5.1— insanity defense—rebuttal of expert testimony—multiple examinations of defendant**

A fair opportunity for the State to rebut defendant's expert psychiatric testimony may include more than one examination of defendant where sound reasons exist for more than one evaluation of defendant's mental status.

Am Jur 2d, Criminal Law § 79.

9. **Constitutional Law § 48; Criminal Law § 5.1— testimony concerning court-ordered psychiatric examination—no violation of right to effective assistance of counsel**

Defendant's right to the effective assistance of counsel was not violated by the admission of a psychiatric evaluation team's testimony concerning information obtained during a second court-ordered psychiatric examination of defendant because that evaluation was ordered for the purpose of determining defendant's capacity to proceed rather than his sanity at the time of the crimes where (1) defendant had the opportunity to discuss with his lawyer whether to submit to the second examination and to discuss the scope of the examination, and (2) under the decision of *State v. Jackson*, 77 N.C. App. 491 (1985), defendant was on notice that by placing his sanity at issue, the State was empowered to order its own examination and that the scope of that examination would include the basis to rebut his insanity defense. Sixth Amendment to the U. S. Constitution; Art. I, § 23 of the N. C. Constitution.

Am Jur 2d, Criminal Law §§ 752, 984, 985.

10. **Constitutional Law § 28— due process—Fifth Amendment—protection against federal government**

Defendant's claim that the trial court's instructions in his prosecution in state court for state crimes violated the due process clause of the Fifth Amendment to the U. S. Constitution was without merit since the Fifth Amendment protects individuals only against due process violations by the federal government.

Am Jur 2d, Constitutional Law § 806; Criminal Law § 825.

STATE v. HUFF

[325 N.C. 1 (1989)]

**11. Criminal Law § 163— instructions—absence of objection— plain error rule**

Where defendant did not object at trial to the instructions which he now assigns as error, he waived his right to appellate review of such instructions except under the plain error standard.

**Am Jur 2d, Appeal and Error §§ 553, 562, 623.**

**12. Criminal Law § 111.1— two murder charges—instructions— joint determination of guilt not permitted**

The trial court's instructions in a trial of defendant on two charges of first degree murder could not reasonably have been understood by the jury to permit a joint determination of guilt on the two murder charges, although the trial court on occasion referred to a single "victim," stated that the State has the burden of "proving the case" and that "the decision in the case must be unanimous," and referred to a single offense in giving pattern jury instructions on insanity, where the court's instructions and mandates, taken as a whole, and the verdict sheet submitted to the jury made clear that the jury was to consider each charge separately in the determination of defendant's guilt or innocence.

**Am Jur 2d, Appeal and Error §§ 623, 815.**

**13. Criminal Law § 135.8— especially heinous aggravating circumstance—sufficient guidelines for jury**

The trial court's submission of the "especially heinous, atrocious or cruel" aggravating circumstance in a first degree murder case did not allow the jury unguided discretion in determining what facts are sufficient to find that the circumstance exists where the jury was instructed that it applies only to a "conscienceless or pitiless crime which is unnecessarily torturous to the victim." N.C.G.S. § 15A-2000(e)(9).

**Am Jur 2d, Appeal and Error §§ 815, 817; Trial § 608.**

**14. Criminal Law § 135.8— first degree murder of infant—especially heinous aggravating circumstance—sufficiency of evidence**

The evidence was sufficient to support the court's submission of the especially heinous, atrocious or cruel aggravating circumstance in a first degree murder case where it tended to show that the nine-month-old victim died by suffocation after

defendant, the child's father and primary caregiver, buried him alive, and that the child was struggling for his life while suffocating in the earthen grave and thus experienced extreme physical and psychological torture immediately before his death.

**Am Jur 2d, Homicide § 485; Trial § 608.**

15. **Criminal Law § 135.8 — especially heinous aggravating circumstance — consideration of victim's age**

The jury could properly consider the age of the nine-month-old victim in determining the weight of the aggravating circumstance that the first degree murder of the victim was especially heinous, atrocious or cruel.

**Am Jur 2d, Homicide §§ 9, 48.**

16. **Criminal Law § 135.7 — meaning of mitigating circumstances — erroneous instruction cured**

Error by the trial court in using the term "best deserving" of the death penalty in instructing the jury as to the meaning of "mitigating circumstances" was cured by a following instruction using the term "less deserving."

**Am Jur 2d, Homicide § 562.**

17. **Criminal Law § 135.9 — nonstatutory mitigating circumstance — peremptory instruction — findings of existence and mitigating value**

The trial court's peremptory instructions on nonstatutory mitigating circumstances in a first degree murder case were not erroneous in requiring the jury to determine both that the evidence supports the existence of the nonstatutory circumstance and that the circumstance has mitigating value in order to "find" such circumstance.

**Am Jur 2d, Homicide § 498.**

18. **Criminal Law § 135.7 — first degree murder — instructions on duty to recommend death sentence**

The trial court in a first degree murder case did not err in instructing that the jury must recommend a sentence of death if it found that the mitigating circumstances were insufficient to outweigh the aggravating circumstances (issue three) and if it found that the aggravating circumstances were

sufficiently substantial to call for the death penalty when considered with the mitigating circumstances (issue four).

**Am Jur 2d, Homicide § 513.**

19. **Criminal Law § 135.9— mitigating circumstances—burden of proof—unanimity**

Due process is not violated by requiring the defendant in a capital case to prove mitigating circumstances by a preponderance of the evidence; nor is it constitutional error to instruct the jury that it must reach unanimous agreement before finding mitigating circumstances.

**Am Jur 2d, Homicide §§ 508, 514.**

20. **Criminal Law § 135.7— capital case—nonunanimous sentence verdict—unanimity instructions—unanimous verdict not coerced**

The trial judge's unanimity instructions following the jury's return of a nonunanimous verdict recommending life imprisonment in a first degree murder case on Friday afternoon did not coerce a unanimous sentencing verdict where the court further instructed the jury before it retired to deliberate for the last time on Monday morning that if the jury determined "that with a reasonable amount of additional deliberations you will not be able to reach a unanimous recommendation, you should give the Bailiff a note to that effect, and the Bailiff will bring you back into the courtroom."

**Am Jur 2d, Trial §§ 1054, 1055.**

21. **Criminal Law §§ 102.12, 135.4— capital case—failure to reach unanimous sentence verdict—life imprisonment—jury argument prohibited**

The trial court properly prohibited defense counsel from informing the jury in argument that the capital punishment statute authorizes the trial court to impose a life sentence if the jury is unable to return a unanimous sentence verdict.

**Am Jur 2d, Homicide § 513.**

22. **Criminal Law § 135.4— capital case—nonunanimous sentence verdict—further deliberations—refusal to impose life sentence**

The trial court did not violate N.C.G.S. § 15A-2000(b) by failing to impose a life sentence for a first degree murder when the jury returned a nonunanimous verdict on Friday after-

noon after two hours of deliberation or when the trial was reconvened on Monday morning after the jury had deliberated an additional forty-five minutes where the jury considered two charges of first degree murder, and a total of three aggravating circumstances and forty-eight mitigating circumstances were submitted in the two cases.

**Am Jur 2d, Homicide §§ 549 et seq.**

**23. Criminal Law § 102.6— capital case—jury argument—jury as conscience of community**

The prosecutor's jury argument during the sentencing phase of a capital trial that the jury is the voice and conscience of the community by its verdict in the guilt-innocence phase and its punishment decision was not improper.

**Am Jur 2d, Homicide § 463.**

**24. Criminal Law § 135.9— capital case—mitigating circumstances —prosecutor's definition not erroneous**

The prosecutor's jury argument defining a mitigating circumstance as evidence that lessens or reduces the severity of the crime during the sentencing phase of a first degree murder case did not imply that the jury would have to find that evidence was sufficient to reduce the crime of first degree murder to some lesser included offense in order to find that it had mitigating value and was not erroneous.

**Am Jur 2d, Homicide § 463.**

**25. Criminal Law § 135.9— capital case—jury argument—differentiation of statutory and nonstatutory mitigating circumstances —absence of error**

The prosecutor's jury argument that the statutory mitigating circumstances submitted in a first degree murder case had "been passed into law by the legislature," so that the legislature had therefore provided for their consideration by the jury, and that the nonstatutory mitigating circumstances were "created and urged" upon the jury by defense counsel did not imply that the nonstatutory mitigating circumstances were unworthy of the jury's consideration and was not improper.

**Am Jur 2d, Homicide § 463.**

STATE v. HUFF

[325 N.C. 1 (1989)]

**26. Criminal Law § 128.2— capital case—improper testimony— denial of mistrial**

The trial court did not err in denying defendant's motion for a mistrial in this first degree murder case when defendant's former girlfriend testified that a card with the word "killed" inscribed upon it in black and red ink to approximate dripping blood had been placed in her mailbox while defendant was in jail awaiting trial where the trial court immediately sustained defendant's objection, granted defendant's motion to strike, and appropriately instructed the jury.

**Am Jur 2d, Homicide § 316.**

**27. Criminal Law § 135.4— capital case—separate juries not required—death qualification of jurors**

The trial court did not err in denying defendant's motion for separate juries for the guilt-innocence and penalty phases of his first degree murder trial and his motion to prohibit the State from "death qualifying" the jurors.

**Am Jur 2d, Criminal Law § 527.**

**28. Criminal Law § 5— test of insanity constitutional**

The North Carolina law on insanity is not unconstitutional.

**Am Jur 2d, Criminal Law §§ 46 et seq.**

**29. Criminal Law § 5.1— insanity and guilt issues—bifurcated trial not required**

The trial court did not err in denying defendant's motion for a bifurcated trial on the issues of insanity and guilt-innocence.

**Am Jur 2d, Criminal Law § 73.**

**30. Criminal Law § 135.3— excusal of jurors for capital punishment views**

The trial court did not err in excusing jurors for cause in a first degree murder trial because of their opposition to capital punishment.

**Am Jur 2d, Homicide § 466.**

**31. Criminal Law § 135.4— constitutionality of death penalty statute**

The North Carolina death penalty statute, N.C.G.S. § 15A-2000, is constitutional.

**Am Jur 2d, Homicide § 556.**

STATE v. HUFF

[325 N.C. 1 (1989)]

32. **Criminal Law § 135.8; Indictment and Warrant § 13.1— capital case—aggravating factors—bill of particulars not required**

The trial court did not err in denying defendant's motion for a bill of particulars from the State disclosing the aggravating factors upon which it proposed to rely in seeking the death penalty.

**Am Jur 2d, Homicide § 554.**

33. **Criminal Law § 135.10— murder of infant son—death penalty not disproportionate**

A sentence of death imposed on defendant for the first degree murder of his infant son was not disproportionate to the penalty imposed in similar cases where the son died from suffocation after being buried alive; defendant was also found guilty of the first degree murder of his mother-in-law committed the same day; and the jury found as aggravating factors that defendant had previously been convicted of a felony involving the use of violence to the person and that the murder of his son was especially heinous, atrocious or cruel.

**Am Jur 2d, Homicide § 554.**

Chief Justice EXUM concurring.

Justice WEBB concurring.

Justice FRYE dissenting as to sentence.

APPEAL by defendant pursuant to N.C.G.S. § 7A-27(a) from convictions and judgments entered thereon imposing a sentence of death for the murder in the first degree of Crigger Huff and a sentence of life imprisonment for the murder in the first degree of Gail Strickland, entered by *Brewer, J.,* at the 8 June 1987 Criminal Session of Superior Court, CUMBERLAND County. Heard in the Supreme Court 13 December 1988.

*Lacy H. Thornburg, Attorney General, by Steven F. Bryant, Assistant Attorney General, for the State.*

*James R. Parish and Gregory A. Weeks for defendant-appellant.*

MEYER, Justice.

Defendant was convicted of two counts of first-degree murder, both of them upon the theory of premeditation and deliberation.

Conviction on the first count was for the murder of defendant's infant son, Crigger Huff. Conviction on the second count was for the murder of defendant's mother-in-law, Gail Strickland. The court submitted and the jury found two aggravating circumstances in the murder of Crigger Huff: that defendant had been previously convicted of a felony involving the use of violence to the person and that the murder was especially heinous, atrocious or cruel. The court submitted and the jury found a single aggravating circumstance in the murder of Gail Strickland: that defendant had been previously convicted of a felony involving the use of violence to the person. In both cases, the court submitted the same twenty-four possible mitigating circumstances. The jury found the same two mitigating circumstances in both cases: that "[t]he capital felony was committed while the defendant was under the influence of mental or emotional disturbance" and that "[d]efendant was under a great deal of stress at the time of the offenses." Upon the jury's recommendation, the trial court sentenced defendant to death for the murder of the infant, Crigger Huff, and to life imprisonment for the murder of Gail Strickland. We find no error.

The State's evidence tended to show the following:

On 1 January 1984 defendant and Debra Strickland were married in Boston, Massachusetts. Their son, Crigger Stephen Huff, was born eight days later in Fayetteville, North Carolina. Since the child was premature, he was transferred to North Carolina Memorial Hospital in Chapel Hill where he remained until the end of February. Defendant and his wife lived in Greensboro with her mother, Gail Strickland, until the baby's discharge from the hospital, at which time they returned to Fayetteville to live in a house owned by Mrs. Strickland in the Montclair subdivision.

In August 1984, Debra Huff, having enlisted in the U.S. Air Force, left Fayetteville for six weeks of basic training in San Antonio, Texas. Three or four weeks before she left, her mother, Gail Strickland, moved back to Fayetteville to live with defendant and Crigger and to help defendant care for the baby while Debra was away on military duty. Mrs. Strickland found a job as a surgical nurse at a local hospital.

On 25 October 1984, Dorothy Pate, Gail Strickland's co-worker, drove to Strickland's residence between 12:15 and 12:30 p.m. to see why she had not come to work at the hospital that morning. When no one answered Pate's knock at the front door, she looked

through the screen door in the back and saw Gail Strickland lying on a sofa in front of a television, which was operating. Pate called her name, got no response, noticed blood on Gail Strickland's neck, and then left to call the emergency number and to wait in her car until a Cumberland County Sheriff's Deputy arrived.

Deputy Ronald Sykes reached the Strickland house at 12:37 p.m., shortly after an ambulance had arrived. The ambulance crew had already examined Gail Strickland and had determined that she was dead. She was found sitting with her head leaning back. There was an open wallet on the floor and a pocketbook on a chair. Deputy Sykes called for the homicide detectives and then went outside to keep onlookers away from the house. While Deputy Sykes was outside, defendant arrived. He told Sykes who he was and said he had come to the house because he had been told something was wrong.

On 26 October 1984, pathologist Fred Ginn performed an autopsy on Gail Strickland's body. One gunshot wound to the head had caused her death. The bullet had entered behind the left ear lobe and had traveled to the right side of her head, almost horizontally.

Detective Sergeant Robert Bittle of the Homicide Division arrived at the Strickland house about 1 p.m. on 25 October. In a canvass of the neighborhood, his team had discovered that Debra Strickland Huff was stationed at Lackland Air Force Base in San Antonio, Texas, and that Crigger and defendant had been staying with Gail Strickland. The next day they located defendant at his parents' house, also in the Montclair subdivision, and spoke with him. Defendant told detectives that he and his mother-in-law had had a disagreement on 24 October. She had gotten mad at him when she discovered that he had gone through her closet looking for letters Debra Huff had written; she had asked him to leave, had helped him to pack, and he had left for his father's house. He said he had not seen Gail Strickland since 4 or 5 p.m. on 24 October. He told detectives that Crigger was staying with friends.

On 26 October, detectives kept the defendant under surveillance. They saw him walking in the Montclair neighborhood, making several trips between his parents' house and a neighborhood store.

Shortly after 7 p.m. on 26 October, Detective Bittle, after receiving a call from defendant's father, Everett Huff, Sr., went to his house. Defendant was there, seated at the dining room table

with his back to the wall, banging his head against it and crying, "He's dead, he's dead!" He was hysterical and in tears. Emergency medical technicians who were called to examine defendant found his blood pressure elevated, but no treatment was required.

About twenty minutes later, defendant stood and told Detective Bittle: "I will show you." Bittle understood defendant to mean that he would show the officers the location of the baby's body. Defendant led the investigative team behind the house and about 500-600 yards along some railroad tracks. It was about 8 p.m. and getting dark. Defendant pointed to a trail and said, "the grave is at the end." The detectives looked fruitlessly for a few minutes, then defendant pointed out a spot covered over with leaves and twigs. He cleared away the leaves and twigs from an oval-shaped area of recently turned dirt in the hard ground. Two of the officers began digging. About eighteen inches down, the officers found the body of Crigger Huff. The infant's left hand covered his face and mouth. The emergency medical team member present confirmed that the child was dead, and that he had been dead for some time.

Defendant was arrested, charged with both murders, and jailed that night.

Several days later, the police searched the area around the residence of Everett Huff, Sr. Hidden in a doghouse, they found the rifle later determined to be the one with which Gail Strickland had been shot. They also found a spade in the brush near the grave, which defendant said he had used to bury the child.

On 11 February 1985, defendant told a jailer that he wanted to speak to a detective, and the jailer contacted Detective Bruce Daws, the Chief Homicide Investigator. Daws came to the jail, assumed custody of defendant, took him to the homicide office and advised defendant of his Miranda rights, which defendant waived in writing. Then defendant gave Detective Daws and Detective Bittle a nineteen-page statement in which he told the officers that he had killed Crigger Huff and Gail Strickland.

Detective Bittle read defendant's lengthy statement into the record at the trial. In the statement, defendant explained that he had first met Debra Strickland outside her house in the Montclair subdivision. Since she was living in Greensboro and came back to Fayetteville only on weekends, he asked her to go out the next weekend. They started dating and had sexual relations.

After they had been seeing each other for a few weeks, Debra went to Texas to take part in a skating competition. When she returned, she told defendant that she was pregnant. He asked her if the child was his; she said that it was, and they planned to marry in January 1984 when Debra was to move back to Fayetteville. Defendant offered Debra money for an abortion, explaining that "I had a doubt in my mind about it being my baby," but she refused it.

After the two were married, defendant related, "things were rough" financially. When Debra was pregnant she thought she did not have to work, but defendant talked with her about going into the Air Force since she had a college degree and since fringe benefits were available for the family. Debra did not want to enlist at first, but finally agreed. For his part, defendant got a job first at the pizza parlor and later at the bowling alley at Pope Air Force Base. Defendant and Debra's relationship was also "rough." Defendant stated that their conversations turned into arguments about other men defendant believed could have fathered the child. He said that Debra would not look at him when he talked to her, did not like to go out with him, and did not like defendant's going out with his brother to drink beer and smoke marijuana. Faced with these problems, he asked himself, "why did I marry her?"

Defendant described a visit that their family made to Debra's mother, Gail Strickland, who was, according to defendant, "living with a bisexual." During the visit, the housemate grabbed Debra on the behind. Although Debra was unperturbed, defendant confronted her about it, asking, "Why did you let him do that[?]" and stating, "he could be the father of my baby." Defendant asked Gail Strickland about "that bisexual grabbing Debbie's ass." Her mother explained to defendant that "[Debra and her mother's housemate] were dance partners and that they had to develop a physical relationship." Because "God don't approve of homosexuals," defendant told Debra that he was leaving with Crigger, and Debra accompanied them home. Referring to this incident, defendant stated, "No wonder her husband killed himself, he got to wondering about his family."

Defendant stated that he and Debra's mother, Gail Strickland, had had an uneasy relationship from the beginning. He said she "disapproved of me." When he confronted her, she told him, "Randy, I don't like you. I never have." He thought she did not like him

"because of prison, tattoos, outward appearance and getting high." Before Debra left for basic training, defendant told her that he did not know if he could live with her mother after Debra went into the Air Force. After Debra left, defendant believed Mrs. Strickland was trying to run him off. She "laid down the rules," requiring defendant to tell her where he was going when he went out and to give her advance notice if he was going to have friends over, though she did not like it when they came over. Defendant claimed that she accused him of smoking marijuana with his friends in the house, but he said that her accusation was false; he had been smoking marijuana *outside* the house.

Defendant stated that people in the neighborhood had tried to tell him about Debra's family: that her mother "screwed around on her husband," that "they were weird, [and] that there was something evil about them and the house. No one liked them."

Defendant reported that he and Gail Strickland argued over custody of the baby. When he told her he was moving out and was going to take the baby with him, she replied, "The baby stays. If you take him out of the house, I will call the police." Defendant told her to call the police, that he was the parent and had custody. Then she again tried to deter him by saying she did not want the baby at defendant's parents' house because defendant's brother Jason (whom she did not like) was there. Furthermore, she said if defendant moved out, she would follow to be "near her grandbaby."

Defendant stated that on Tuesday, 23 October, he had gone through Gail Strickland's closet looking for letters from Debra to her mother, but found none. The next day, Wednesday, 24 October, defendant found letters from Debra to her mother in a file cabinet in the baby's room. After reading the letters, defendant concluded that Debra was being unfaithful to him and that she planned to divorce him and to marry someone else. Defendant thought continuously about the letters as he fed Crigger his breakfast that morning, and when the baby started to cry, "his crying made my mind race and things started coming to me. Why are they treating us like this? He is going to suffer down the road if we divorce. He don't need to be around such filth, the homosexuals, the incest." Defendant drove with the baby to his parents' house, where, "The thought came to my mind, no one loved him or us. So, I decided no one could have him." Defendant got the shed key from his parents' china cabinet, unlocked the shed, got a shovel, and re-

turned the key to its place. After defendant drove around awhile with the baby,

> I took the shovel out of the car and dug a hole. I got Booba, that's what I called Crigger, and took him to where I dug the hole. We sat by a tree and I talked with him awhile. I let him play in the leaves for awhile. He was crunching the leaves. I picked him up and brushed him off, I didn't get all the leaves off of him. I guess, I didn't care about myself anymore. I picked him up and held him real tight and told him good-bye. I told him I loved him; he was looking at me. I kissed him, I hugged him, and prayed. I started to lay him in the hole, but I hesitated and jerked back. I did lay him in the hole. He started playing with the dirt and playing with the roots that was cut with the shovel. After that, I didn't look at him no more. I shoveled the dirt in on him and put the sod on top. I cried. I was going to dig him back up but I didn't. I threw the shovel away from him. I left, got in the car and drove around.

Defendant stated that he went to the post office, smoked "a joint," and returned to Gail Strickland's house. There, confronted by Gail Strickland, defendant told her he had looked in her closet for Debra's letters to her. Strickland told him that she could not trust him; she wanted him to move out of her house with the baby. Defendant packed his things; Gail Strickland packed the baby's things. Defendant went to his parents' house and told his mother, "I got kicked out." He stored his things there, went to a thrift shop where he sold some of the baby's things, threw the rest in a dumpster, and returned to his parents' house.

Defendant recalled, "Later that night, it dawned on me the implications. I had lost out; . . . I was going to leave." Defendant said that he got his dad's gun to take with him, because "I know the type of people you meet on the road," and put the gun in the doghouse at his parents' house. Then defendant left his parents' house and walked to the neighborhood store. When he got to Gail Strickland's house, defendant stated he saw someone else's car parked in front and he did not stop. On return to his parents' house, defendant again "decided I was going to leave. I got a few things together and I got the gun and put it in the car."

Defendant stated that he then drove to Brittany Place in the Montclair subdivision and parked the car. He walked up Montclair

Road with the gun, but seeing one of Gail Strickland's neighbors playing with numchucks, he walked past Strickland's house a second time, walked on to the store, and got a drink.

Then defendant stated that he walked up to his mother-in-law's house.

> I wanted to talk to her. I went to the front door and knocked, but I didn't get any answer. . . . I went around to the back screen door. She was sleeping on the couch. Johnny Carson was on the TV. So, it must have been eleven-thirty or twelve o'clock. I called her name, 'Gail, can I talk to you?' I pulled out the gun and shot her. I left, walked back to the car and drove around.

Defendant concluded his statement by saying that he returned to his parents' house. There he cleaned the gun, wiped the fingerprints off, put the gun back in the box and put the box back in the doghouse. Then he returned once again to Strickland's house where he went through Gail Strickland's purse, dumped its contents on the floor, and left again on foot.

Dr. Page Hudson, professor of pathology at East Carolina University and formerly the Chief Medical Examiner for the State of North Carolina, conducted the autopsy on Crigger Huff. In Dr. Hudson's opinion, the cause of the child's death was suffocation. The finding was consistent with Crigger Huff being buried alive. Further findings revealed virtually no sand in the mouth, nose, airway, or upper intestinal tract. The absence of sand led Dr. Hudson to draw two possible conclusions: first, that the child might have been dead before being covered up; second, that the child might have died rather quickly before it could breathe a great deal of sand into its nose or mouth or swallow some sand into its esophagus.

The defense introduced evidence of defendant's mental state at the time of the offense.

Dr. James C. Groce, a staff psychiatrist in the Forensic Unit at Dorothea Dix Hospital who examined defendant in January 1986, testified that defendant suffered from a chronic mental illness— paranoid schizophrenia. Although he was unable to form a definite opinion about defendant's sanity at the time of the crimes, he did believe that the mental illness was impairing defendant's think-

ing at the time of the offenses and that defendant probably had had a psychotic break.

Dr. Groce concluded that several of defendant's beliefs were not based in fact but were delusions. These delusions were symptoms of his illness. Defendant told Dr. Groce that he felt his mother-in-law was a lesbian. She was living with a man, and therefore, since she was a lesbian, the man she lived with must be a homosexual. Defendant was sure of that for awhile, but when the man living with his mother-in-law touched defendant's wife on the behind, defendant thought that must mean that the man was not a homosexual, but a bisexual. He also told Dr. Groce that he killed his son "to protect him from the sexual abuse of the lesbians and bisexuals who he was afraid would have control of him and raise him and mistreat him, and also because he knew that this was the way he could guarantee his son going to Heaven." Dr. Groce thought that defendant had other delusions as well.

Dr. Brad Fisher, a clinical psychologist, examined defendant twice — on 5 November 1984, about ten days after the crimes, and again about six months later, on 19 June 1985. He also concluded that defendant suffered from paranoid schizophrenia typified by delusional thinking. He testified that "in the areas where [defendant] had . . . deluded thinking — [on the subjects of] his mother-in-law, his son, his wife and their interconnections" — that defendant was severely limited in his "ability to differentiate right and wrong." He also concluded that defendant had had a stress-induced psychotic break.

Dr. Selwyn Rose, a psychiatrist, examined defendant for the first time in 1984, nine days after the arrest, and interviewed him quarterly for a two-and-one-half-year period after that. In December 1985, he placed defendant on medication to treat his illness, which he also diagnosed as paranoid schizophrenia. Dr. Rose thought that many of defendant's beliefs were delusions, not based in fact, symptoms of his disturbed thinking. Among the delusions he identified were defendant's beliefs that the Strickland family members were involved in all kinds of sexual practices, that because defendant was unloved, Crigger was also unloved by the family, that defendant's wife was unfaithful to him, that Gail Strickland had driven her husband to his death, and that Mr. Strickland had spoken to him from the grave and had told defendant to avenge his death by killing her. Crigger's birth on the same date as the

father's death had a profound and important symbolic meaning to defendant. Dr. Rose believed that defendant shot his mother-in-law because he thought she was evil and sexually perverted. He testified that since defendant's illness made him incapable of rational thinking, he was also incapable of premeditating and deliberating the deaths of his son and mother-in-law. He also testified that defendant killed both during a single psychotic break. In Dr. Rose's opinion, because of the severity of defendant's mental illness, he was unable at the time of the crime to understand the difference between right and wrong or to understand the nature and quality of his actions.

Chaplain Joseph H. McGoughan of the United States Air Force testified that he had received a call from Debra Strickland Huff's platoon sergeant at Lackland Air Force Base in San Antonio, Texas. McGoughan had been asked to talk to defendant about his frequent telephone calls to his wife, which were interfering with her training. On the morning of 24 October defendant came with the baby to talk with the chaplain. Defendant was upset. He told the chaplain that he had made the phone calls to Debra because he had found pictures of other men with her in her negligee. One of the men was her father. He had also found letters from Debra to her father which he interpreted to be "more than a father-daughter-type of love." He thought she had been seeing other men and doubted that he was Crigger's father. The chaplain had examined the letters and had found none of the incestuous overtones defendant reported.

Aileen Sizemore, Gail Strickland's neighbor, testified that she had talked with defendant about a week before the deaths. He had discussed his difficulties in getting along with his mother-in-law and his problems with his wife. He told her that he did not want his baby to be with "Gail because Gail was hanging around gay people." Although Sizemore told defendant, "Randy, that is not true . . . , [h]e seemed to be convinced about it." She recounted his telling her that he thought the Strickland family was "weird," and that Debra was seeing someone in Texas. She had also seen him after Gail's body was discovered. He had sobbed and cried and could not talk very much.

Eugene Mitchell, a longtime friend of the Huff family, testified that he had visited defendant in jail on Saturday, 27 October. He thought defendant had seemed depressed, slow to respond, and very different from the happy father defendant had seemed to be several weeks before.

Ramona Huff, defendant's mother, testified that after Debra left defendant had been concerned about his marriage and had believed Debra was involved with another man. Defendant had told his mother that he had seen Debra playing with the baby's penis while changing his diaper and that incident had upset him. On Wednesday, 24 October, about noon, defendant had come to his mother's place of work to talk with her. He told her that "Gail threw me and Crigger out," that Crigger was staying with friends, and when she offered to take them in, he told her, "No, the baby stays." Defendant and his mother left in separate cars for her house. While driving by Gail Strickland's house, Ramona Huff saw a man squatting down outside the back porch, and when she circled back to see if defendant had stopped by Strickland's, the man was gone and her son was not there either. She found him already home when she arrived. That night defendant was watching television and his mother had lain down on the sofa in the same room. When he got up about 4 a.m., she awoke and asked him where he was going. He told her he was going to sleep with Crigger and left the house. The next morning he returned "with dirt all over his clothes [from] where he had slept with Crigger." She testified that "from Wednesday night on Randy was not Randy . . . it was just like it wasn't registering with him."

On rebuttal the State called five lay witnesses to testify to defendant's mental state at the time of the offenses: Dan Ford, Mary Ellen Meyers, Shelly Brocki, Detective Robert Bittle, and Detective Jack Watts. Dan Ford, Chief Jailer with the Cumberland County Sheriff's Department, oversaw defendant's hour-long in-processing at the jail after his arrest on 26 October 1984. Mary Ellen Balch Meyers, a friend of defendant from the neighborhood, stopped for a few minutes to offer him a ride on 25 October. Meyers and defendant had often talked about defendant's personal problems in the month or two before the killings. Both Ford and Meyers testified that in their opinions defendant knew what he was doing was wrong when he killed Gail Strickland and Crigger Huff. Shelly Brocki, who had dated defendant in the summer of 1983, had talked to him twice for a few minutes on 25 October 1984: the first time when she saw him walking on the roadside before she knew Mrs. Strickland was dead and then about ten o'clock that night at the gas station. She said he was "pale and he didn't look like he normally looked," but she noticed no odd or irrational behavior. In early 1987, defendant had phoned her and had told her "that his lawyers

were trying to get him off on the insanity plea, but he had spoken with God and he knew that wasn't right and that he wanted the death penalty." Detective Robert Bittle had had three contacts with defendant during 25 October and 26 October: a thirty-minute interview in the police car about 3 p.m. on 25 October, visual surveillance of the defendant on the morning of 26 October, and a four to four-and-one-half hour contact on the night of 26 October. During the four-hour contact, Detective Bittle was with the defendant at Everett Huff, Sr.'s house, accompanied defendant to the baby's grave and was with him during in-processing at the jail. Based on his observations of the defendant on 25 and 26 October, Detective Bittle believed that the defendant knew the nature of his acts when he killed his child and his mother-in-law and he also knew the difference between right and wrong in regard to those acts. Detective Jack Watts was with Detective Bittle on 25 October during defendant's interview in the police car and during the evening of 26 October. Based on his observations of the defendant on 25 and 26 October, Detective Watts believed that defendant knew the nature of his acts when he killed his child and his mother-in-law and that he also knew the difference between right and wrong in regard to those acts.

The prosecution also called three expert witnesses who had examined defendant at Dix Hospital to determine his mental state at the time of the offenses: psychologist Dorothy Humphrey, psychiatrist Bob Rollins, and social worker Debbie Keith. Debbie Keith testified that she gathered information for the psychiatrist's use in evaluating defendant. Both Humphrey and Rollins believed defendant had a personality disorder with schizotypal features. As far as they knew, he was not taking psychotropic medication when they saw him in August 1986. Dr. Rollins did not believe that defendant was or had been a paranoid schizophrenic. Humphrey and Rollins both testified that defendant probably knew the nature and quality of his act when he buried his son and that he knew the difference between right and wrong as to his act of burying his son and of shooting his mother-in-law. Dr. Rollins also found that defendant was depressed.

After deliberating for less than two hours and forty-five minutes, the jury found the defendant guilty of the premeditated and deliberate murder of his infant son, Crigger Huff, and of the premeditated and deliberate murder of his mother-in-law, Gail Strickland.

During the sentencing phase, the State called Tracey Sams, defendant's former girlfriend, to testify. She stated that defendant tried to kill her, by shooting into a car which she was driving, after she broke off her relationship with him in November 1979. The State also introduced the judgment of defendant's conviction for discharging a firearm into an occupied vehicle.

Defendant also presented evidence during the sentencing phase. Linda Oxendine, defendant's sister's childhood friend, testified that she and other neighborhood children congregated at the Huffs' house to drink beer and smoke marijuana during defendant's teen years. Defendant's parents knew about the drug use and did nothing to stop it. Terry Oxendine testified that, in the few months they were together at the bowling alley at Pope Air Force Base, defendant was a good co-worker and was well liked by the customers. Marsha Wright, defendant's supervisor at the pizza parlor at Pope Air Force Base, testified that defendant was a good worker. Charles Montooth, defendant's junior high school principal, testified to defendant's sometimes neglected appearance during his junior high school years, to his poor attendance, and to his lack of parental support. Defendant's older sister related that his early childhood was characterized by family violence; their father had had a drinking problem until defendant was thirteen.

GUILT PHASE

I.

In his first assignment of error, defendant contends that the trial court erred in allowing the two murder charges to be joined for trial. Defendant contends that joinder of these charges violated N.C.G.S. § 15A-926(a) and deprived him of due process guaranteed by the fifth and fourteenth amendments of the United States Constitution and by article I, sections 18 and 19 of the North Carolina Constitution. We disagree.

In ruling on a motion to join, the trial judge must first determine if the statutory requirement of a transactional connection is met. E.g., State v. Silva, 304 N.C. 122, 126, 282 S.E. 2d 449, 452 (1981). On appeal, the question of whether offenses are transactionally related so that they may be joined for trial is a fully reviewable question of law. Id.

N.C.G.S. § 15A-926(a) provides:

> Two or more offenses may be joined . . . for trial when the
> offenses . . . are based on the same act or transaction or on
> a series of acts or transactions connected together or con-
> stituting parts of a single scheme or plan.

N.C.G.S. § 15A-926(a) (1988).

Once the trial judge concludes the offenses are transactionally connected, he or she must determine if the defendant can receive a fair hearing on each charge if the charges are tried together. *State v. Greene*, 294 N.C. 418, 421, 241 S.E. 2d 662, 664 (1978); *State v. Davis*, 289 N.C. 500, 508, 223 S.E. 2d 296, 301, *death sentence vacated*, 429 U.S. 809, 50 L.Ed. 2d 69 (1976). If consolidation hinders or deprives the accused of his ability to present his defense, the charges should not be consolidated. *Pointer v. United States*, 151 U.S. 396, 38 L.Ed. 208 (1894); *Dunaway v. United States*, 205 F. 2d 23 (D.C. Cir. 1953); *State v. Greene*, 294 N.C. 418, 421, 241 S.E. 2d 662, 664 (1978); *State v. Davis*, 289 N.C. 500, 508, 223 S.E. 2d 296, 301, *death sentence vacated*, 429 U.S. 809, 50 L.Ed. 2d 69 (1976). However, the trial judge's decision to consolidate for trial cases having a transactional connection is within the discretion of the trial court and, absent a showing of abuse of discretion, will not be disturbed on appeal. *State v. McNeil*, 324 N.C. 33, 40, 375 S.E. 2d 909, 914 (1989).

Defendant argues joinder was improper for two reasons: because the charges were not transactionally related and because joinder hindered his ability to present his defense. Neither argument has merit.

[1] First, we agree with the trial court that there is sufficient evidence of a transactional connection to support joinder of the two homicide charges for trial. Like the defendant in *State v. McNeil*, 324 N.C. at 40, 375 S.E. 2d at 914, defendant committed both offenses for the same purpose as part of a single scheme or plan. In *McNeil*, we found a transactional connection between two robbery/murders that were committed to satisfy defendant's need for cash to pay his rent and other bills. In this case, the evidence tends to show that defendant was troubled by serious and persistent problems: in getting along with his mother-in-law, Gail Strickland, in maintaining a relationship with his wife, Debbie, and in his feelings that his child was unloved by the family. Defendant saw as inevitable a divorce from Debbie followed by a custody battle over their son Crigger. He believed Crigger would

STATE v. HUFF

[325 N.C. 1 (1989)]

be placed in his wife's custody and continuously exposed to his wife's family whom he viewed as perverted. The evidence also shows that defendant saw these as interrelated problems to which he developed a unified solution. To spare the child the custody battle and what he considered the taint from exposure to the Strickland family, he killed Crigger. That night, he went to Gail Strickland's house and shot her. As in *McNeil*, the connecting thread running through these acts was defendant's common scheme or plan to resolve the problems created by his perception of his situation.

Further, a transactional connection exists because the two crimes are so closely related in time that they appear to be parts of a continuous criminal episode. *State v. Avery*, 302 N.C. 517, 276 S.E. 2d 699 (1981) (series of crimes during a two-day period of escape from prison); *State v. Clark*, 301 N.C. 176, 270 S.E. 2d 425 (1980) (offenses one after the other on the same afternoon); *State v. Greene*, 294 N.C. 418, 241 S.E. 2d 662 (1978) (two sexual assaults within three hours); *State v. Davis*, 289 N.C. 500, 223 S.E. 2d 296 (four offenses within two and a half hours), *death penalty vacated*, 429 U.S. 809, 50 L.Ed. 2d 69 (1976). The evidence tends to show that defendant buried his child during the day on 24 October and that he shot his mother-in-law before she had retired that same night.

[2] Defendant also argues that he was hindered in his ability to present his defenses. First, he argues that he was prejudiced by the consolidation because he would have had a better chance for a conviction of second-degree murder instead of the first-degree murder of Gail Strickland had the two charges not been consolidated for trial. He contends that the jury was unable to separate the "strong" evidence of premeditation and deliberation in the killing of Crigger Huff from the weak evidence of premeditation in the killing of Gail Strickland and so cumulated the evidence of premeditation and deliberation in the two cases in order to convict him of the first-degree murder of Gail Strickland.

Second, defendant argues that a fair determination on the issue of his insanity at the time of the killing of Crigger Huff was hindered by joinder of the additional homicide charge and by having to defend the two together. He asserts that he was forced into the unconscionable dilemma of presenting dissimilar main defenses: insanity as to the homicide of Crigger Huff and lack of premeditation and deliberation as to the homicide of Gail Strickland.

We address both contentions. First, we disagree with defendant's assertion that the evidence of premeditation and deliberation was weak in the killing of Gail Strickland. "Premeditation" is defined as "thought beforehand, for some length of time, however short." *State v. Quesinberry*, 319 N.C. 228, 230, 354 S.E. 2d 446, 448 (1987) (citations omitted). A defendant acts with "deliberation" if his act is carried out while he is in a " 'cool state of blood,' without legal provocation, and . . . to accomplish some unlawful purpose. The intent to kill must arise from 'a fixed determination previously formed after weighing the matter.' " *Id.* (citations omitted). Because premeditation and deliberation are mental processes, they are rarely susceptible of proof by direct evidence. *Id.* at 231, 354 S.E. 2d at 448. Several circumstances from which the jury may infer premeditation and deliberation are (1) lack of provocation on the part of the deceased, *id.*; (2) the conduct and statements of the defendant before and after the killing, *id.*; and (3) ill-will or previous difficulty between the parties, *State v. Gladden*, 315 N.C. 398, 430, 340 S.E. 2d 673, 693, *cert. denied*, 479 U.S. 871, 93 L.Ed. 2d 166 (1986). There are numerous circumstances from which a jury might infer that defendant premeditated and deliberated the killing of Gail Strickland. Defendant's statement and other testimony reveal no evidence that Gail Strickland provoked the defendant: to the contrary, defendant's statement indicated that he shot her while she slept on the sofa. From defendant's conduct before the killing, the jury could infer that he had planned to go to Gail Strickland's house to shoot her: He obtained a gun from his parents' house, passing by her house several times until he could enter unobserved. Defendant's conduct after the killing is also evidence of premeditation and deliberation: On return to his parents' house, he cleaned the gun, wiped off the fingerprints, and hid it in the doghouse. He returned to the Strickland house, went through Gail Strickland's purse, and dumped the contents on the floor. The jury could infer that his return to the house after the killing to dump the contents of the purse was an attempt to make the killing appear to have occurred in the course of a robbery. Defendant's statement, corroborated by many witnesses and controverted by none, is substantial evidence of ill-will and of previous difficulties between defendant and Mrs. Strickland. Having found ample evidence of premeditation and deliberation in the killing of Gail Strickland, we also find that there was no danger that the jury cumulated the evidence of premeditation and deliberation in the two cases in order to convict defendant of the first-degree murder of Gail Strickland.

Nor do we find that consolidation of the two charges denied defendant a fair determination on the issue of his insanity at the time of the killing of Crigger Huff or on the issue of his lack of premeditation and deliberation at the time of the killing of Gail Strickland by having to present conflicting defenses in a single trial. Contrary to defendant's assertion, the evidence shows that defendant did not present insanity as to the homicide of Crigger Huff and lack of premeditation and deliberation as to the homicide of Gail Strickland. Defendant presented two defenses on both charges, the defense of insanity and the defense of lack of premeditation and deliberation. Defendant's expert witnesses offered substantial evidence which tended both to establish insanity and that defendant's ability to premeditate and to deliberate was impaired. Defendant's expert witnesses testified that the two killings occurred during a single episode of psychosis, that defendant was suffering from the mental condition of paranoid schizophrenia typified by delusions, that defendant did not know at the time of the offense if the acts of killing Crigger Huff and Gail Strickland were right or wrong, and that his thinking was impaired at the time of the offenses. Dr. Rose also specifically testified that defendant's mental condition made him incapable of premeditating and deliberating the deaths of his son and mother-in-law. The issues were fairly presented for the jury's consideration. The jury apparently simply chose not to believe this evidence but chose to believe the evidence presented by the State to the contrary.

For these reasons, we hold that neither of defendant's arguments of possible prejudice to the presentation of his defenses, alone or in combination, is sufficient to show that the judge abused his discretion in allowing consolidation of the charges for trial.

Having found no statutory violation, we now turn to defendant's contention that consolidation of these two homicide charges for trial constitutes various constitutional violations. Defendant merely asserts that the facts of the two murders and the dissimilar defenses to each hindered a fair determination of his guilt or innocence which he asserts violated the fifth and fourteenth amendments of the United States Constitution and sections 18 and 19 of article I of the North Carolina Constitution. Defendant makes no argument or explanation of how consolidation of the offenses for trial violates any one of these provisions. We thus decline to address defendant's assertions.

STATE v. HUFF

[325 N.C. 1 (1989)]

## II.

In his second assignment of error, defendant contends that the trial court committed reversible error in permitting defendant to be absent during part of the presentation of the prosecution's evidence in defendant's capital case. We agree that under article I, section 23 of the North Carolina Constitution the trial court erred in permitting defendant to be absent during his capital trial, but find that the State has shown that the error was harmless beyond a reasonable doubt.

These are the circumstances of defendant's absence. During the prosecution's case-in-chief Detective Bruce Daws was allowed to read to the jury the nineteen-page statement of the defendant in which he admitted killing Crigger Huff and Gail Strickland. As Detective Daws read defendant's description of an argument he had had with Mrs. Strickland, defendant banged on the defense counsel table, called Mrs. Strickland a "bitch," stood up, attempted to overturn the defense counsel table, and began to cry. Court was recessed and the jurors were sent out of the courtroom. Defendant's counsel and the bailiff attempted to calm the defendant, and court was then reconvened. As Detective Daws resumed reading defendant's statement describing events leading up to defendant's burying his child, defendant began to weep audibly.[1] As the wit-

---

1. The record reflects the following (Detective Daws reading defendant's statement):

"I turned around and went back. I went by a friend's house, Myron West, no one was at home. Drove around places I used to go, neighborhoods. I drove back to Wind Tree Place behind Montclair, drove back to some dirt piles, — "

(THE WITNESS CRYING OUT LOUD, SAYING THE FOLLOWING.)

DEFENDANT: Don't say it, please?

(DEFENDANT CRYING OUT LOUD.)

DEFENDANT: Please don't say it? Please don't? Please don't?

(DEFENDANT CRYING OUT REAL LOUD AGAIN.)

DEFENDANT: Please, Mr. Daws, don't say it, please? (Pause.) Please, Mr. Daws, don't say it, please?

(MR. BRITT AND MS. TALLY APPROACHING THE BENCH, AND AFTER CONFERENCE WITH THE COURT.)

ness continued to read, defendant cried out, repeating, "Please, don't say it? Please don't? Please don't?" Counsel approached the bench; the jury was excused; defendant was removed from the courtroom, and the trial court agreed to defendant's and defense counsel's request to allow the trial to proceed in defendant's absence.[2] The trial judge also agreed to instruct the jury that the trial was proceeding in defendant's absence at his request and at his attorneys' request. The trial judge advised counsel to approach the bench whenever defendant was ready to return and that they could have a recess at any time to confer with the defendant to determine if he wished to return. The jury was returned to the courtroom and the requested instruction given. Defendant remained absent during the remainder of Detective Daws' testimony. Detective Daws continued reading defendant's statement and was excused when he had completed it. A second prosecution witness, Dr. Page Hudson, testified to the results of his autopsy of Crigger Huff's body. During Dr. Hudson's testimony, counsel requested a bench conference; the trial court excused the jury, and noted for the record that defendant remained absent at his own request. The jury returned and the trial resumed until it was recessed a short time later for a ten-day period. Defendant acknowledges that he was present when the court reconvened ten days later for the presentation of defendant's evidence. Defendant argues that his absence during the conclusion of Daws' reading of the statement and during Dr. Hudson's testimony was reversible error.

---

COURT: Ladies and gentlemen, I am going to ask that you go with the Bailiff to the Jury Deliberation Room.

(JURY RETIRED.)

(THE DEFENDANT LEAVES COURTROOM IN CUSTODY OF BAILIFFS.)

MR. BRITT: Your Honor, after consulting with Mr. Huff, we request that we proceed, at least with this portion of the trial, in his absence. That is his wish.

COURT: The Court notes for the record that it is at the request of the Defendant, the Court is proceeding in his absence. The Court specifically notes for the record that the Defendant is not being removed from the courtroom by the Court.

2. We do not address the applicability of N.C.G.S. § 15A-1032, "Removal of Disruptive Defendant" (1988). While defendant's conduct here could be characterized as disruptive, the trial court did not excuse defendant from the courtroom based on his disruptive conduct but did so in response to the request of defendant and his attorneys. Nor do we address the question of whether there can be "constructive" presence made necessary by reason of defendant's disruptive conduct.

STATE v. HUFF

[325 N.C. 1 (1989)]

The confrontation clause of the North Carolina Constitution provides in pertinent part: "In all criminal prosecutions, every person charged with crime has the right . . . to confront the accusers and witnesses with other testimony. . . ." N.C. Const. Art. I, § 23 (1984). Although the United States Supreme Court has stated that the confrontation clause of the federal constitution guarantees each criminal defendant the fundamental right to personal presence at *all critical stages* of the trial, *e.g., Rushen v. Spain,* 464 U.S. 114, 117, 78 L.Ed. 2d 267, 272 (1983), our state constitutional right of confrontation has been interpreted as being broader in scope, guaranteeing the right of every accused to be present at *every stage* of his trial. *State v. Payne,* 320 N.C. 138, 357 S.E. 2d 612 (1987); *State v. Braswell,* 312 N.C. 553, 324 S.E. 2d 241 (1985); *State v. Pope,* 257 N.C. 326, 126 S.E. 2d 126 (1962); *State v. Cherry,* 154 N.C. 624, 70 S.E. 294 (1911); *State v. Dry,* 152 N.C. 813, 67 S.E. 1000 (1910); *State v. Pierce,* 123 N.C. 748, 31 S.E. 847 (1898); *State v. Mitchell,* 119 N.C. 786, 25 S.E. 783 (1896); *State v. Kelly,* 97 N.C. 404, 2 S.E. 185 (1887); *State v. Jenkins,* 84 N.C. 812 (1881); *State v. Craton,* 28 N.C. (6 Ired.) 165 (1845).

We have interpreted the state constitutional protection afforded the capital defendant as being even broader, guaranteeing the accused not only the right to be present at each and every stage of trial, but also providing that defendant's right to be present cannot be waived, and imposing on the trial court the duty to insure defendant's presence at trial. *E.g., State v. Payne,* 320 N.C. 138, 357 S.E. 2d 612.

In the first case which we were able to find addressing the issue of defendant's absence during a capital trial, Judge Battle[3] stated the history, the rationale, and the source of the right. *State v. Blackwelder,* 61 N.C. (Phil. Law) 38 (1866) (per curiam). He explained,

> that the general impression among the profession in this State is, and always has been, that he [the capital defendant] has such right [to be present at the bar at all times during his trial]; and that the practice has always been in conformity to this impression. The point has never been directly adjudicated, but in the case of *S. v. Craton,* 6 Ire., 104, [28 N.C. 165, 169

---

3. Prior to 1869, members of the Court other than the Chief Justice were known officially as "Judges of the Supreme Court."

(1845),] the implication in favor of the existence of the right is so strong that we must regard it as equivalent to a positive decision.

*Id.* at 39. This rule, Judge Battle wrote, is "but a full development of the principles contained in the 7th section of the Declaration of Rights [a predecessor to article I, section 23]: 'That in all prosecutions every man has a right to be informed of the accusation against him, and to confront the accusers with witnesses and other testimony'; and as such, it ought to be kept forever sacred and inviolate." *Id.*

Our cases teach us that this constitutional requirement of defendant's presence at his capital trial protects not only the defendant, but public interests as well: "Defendant's presence at his trial for a capital felony . . . is a matter of public as well as private concern. Public policy requires his attendance at such a trial." *State v. Moore,* 275 N.C. 198, 209, 166 S.E. 2d 652, 659 (1969) (citation omitted). Among the public interests protected by the requirement is the public's interest in preserving human life. *State v. Kelly,* 97 N.C. 404, 406, 2 S.E. 185, 186 (1887) ("the rule that he [the accused] must be so present in capital felonies is *in favorem vitae* . . . founded in the tenderness and care of the law for human life . . ."); *accord, State v. Paylor,* 89 N.C. 539, 541 (1883) ("in favor of life, this rule is never relaxed"). The requirement of the criminal defendant's presence at his capital trial also protects the integrity of the system by preserving the appearance of fairness and by optimizing the conditions for finding the truth.

[3] Because public interests are implicated in the capital trial, the constitutional right of the accused to be present at his capital trial has been elaborated to safeguard these public concerns. Our Court has repeatedly stated that the accused cannot waive the right to be present at a capital trial, *State v. Payne,* 320 N.C. 138, 357 S.E. 2d 612 (1987); *State v. Moore,* 275 N.C. 198, 166 S.E. 2d 652 (1969); *State v. Pope,* 257 N.C. 326, 126 S.E. 2d 126 (1962); *State v. O'Neal,* 197 N.C. 548, 149 S.E. 860 (1929); *State v. Cherry,* 154 N.C. 624, 70 S.E. 294 (1911); *State v. Dry,* 152 N.C. 813, 67 S.E. 1000 (1910), which the law permits him to do with other, personal trial rights, *State v. Moore,* 275 N.C. 198, 208-09, 166 S.E. 2d 652, 659 (defendant's federal constitutional right to confront the witnesses against him at trial is "a personal privilege for the benefit of the accused which does not affect the general public," and may be waived by him). Furthermore, the Court im-

poses a duty on the trial judge to insure defendant's presence throughout the trial. *State v. Payne*, 320 N.C. 138, 357 S.E. 2d 612 (1987); *State v. Paylor*, 89 N.C. 539 (1883); *State v. Jenkins*, 84 N.C. 812 (1881); *State v. Blackwelder*, 61 N.C. (Phil. Law) 38 (1866); *State v. Craton*, 28 N.C. (6 Ired.) 165 (1845).

[4] Defendant has argued that the requirement of defendant's presence at his capital trial is rooted both in the state constitutional confrontation requirement and in a separate line of North Carolina cases rooted in the custom and traditions of practice of this state. We are aware that at least one ancient case, *State v. Kelly*, 97 N.C. 404, 406, 2 S.E. 185, 186 (1887), has stated in dictum that the requirement of defendant's presence at his capital trial is different from and broader than the state constitutional provision. However, more recently, this Court has clearly stated that the rule's source is the confrontation clause: " 'In the application of this fundamental principle (*the right of confrontation*) it has been held that in a capital felony the prisoner cannot waive his right to be present at any stage of the trial.' " *State v. Ferebee*, 266 N.C. 606, 609, 146 S.E. 2d 666, 668 (1966) (emphasis added) (quoting *State v. O'Neal*, 197 N.C. 548, 549, 149 S.E. 860, 860 (1929) ). In light of the language in *Ferebee* and in *Blackwelder*, 61 N.C. at 39, anchoring the right in the confrontation clause, the statement in *Kelly* cannot be regarded as authoritative. We hold that article I, section 23 is the sole source of the criminal defendant's non-waiveable state right to be present at every stage of his capital trial and of the corollary duty imposed on the trial court to insure his presence.

In our prior cases involving violations of defendant's right to be present at his capital trial, this Court has applied two different standards of reversal: the reversible error per se standard and the harmless error standard. In the three capital cases we were able to find involving violations of defendant's right to be present, two very old cases held that violation of the right to be present at a capital trial was reversible per se, and the Court ordered a new trial in each case. *State v. Dry*, 152 N.C. 813, 67 S.E. 1000 (1910) (defendant given permission by the trial judge to absent himself during jury selection in a capital murder trial); *State v. Blackwelder*, 61 N.C. (Phil. Law) 38 (1866) (murder charge; court instructed jury during defendant's absence from the court-

room).[4] In a recent case, *State v. Payne*, 320 N.C. 138, 357 S.E. 2d 612 (1987) (capital murder; admonitions to the jury delivered in absence of defendant, counsel, and court reporter), the Court analyzed the error to determine if the defendant had been harmed. In that case, the Court required the State to show that the error in defendant's trial was harmless beyond a reasonable doubt. *Id.* at 140, 357 S.E. 2d at 613. The State failed to do so, and the Court ordered a new trial for defendant. *Id.*

[5] We have reexamined our previous decisions and conclude that the proper standard of reversal is the harmless error standard. We first review the federal cases. In *Chapman v. California*, 386 U.S. 18, 17 L.Ed. 2d 705 (1967), the United States Supreme Court rejected the argument that errors of constitutional dimension necessarily require reversal of criminal convictions. Since *Chapman*, the Supreme Court has "reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 89 L.Ed. 2d 674, 684 (1986), *quoted in Rose v. Clark*, 478 U.S. 570, 576, 92 L.Ed. 2d 460, 469 (1986). "The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Delaware v. Van Arsdall*, 475 U.S. at 681, 89 L.Ed. 2d at 684-85 (citations omitted), *quoted in Rose v. Clark*, 478 U.S. at 577, 92 L.Ed. 2d at 470. Despite the strong interests

---

4. The reversible error per se rule was also sometimes applied in noncapital felony cases involving defendant's absence during trial. *State v. O'Neal*, 197 N.C. 548, 149 S.E. 860 (1929) (defendant charged with prohibition laws violation; defendant absent from courtroom on verdict's return); *State v. Jenkins*, 84 N.C. 812 (1881) (defendant charged with burning a mill; jury returned verdict in defendant's absence). In other noncapital felony trials, the Court has required the defendant to show how the error prejudiced him. *State v. Braswell*, 312 N.C. 553, 324 S.E. 2d 241 (1985) (noncapital murder; defendant absent during voir dire of witness); *State v. Pope*, 257 N.C. 326, 126 S.E. 2d 126 (1962) (three counts of felonious breaking or entering, four larceny counts; after defendant entered guilty plea, judge conducted a presentence investigation out of defendant's presence); *State v. Pierce*, 123 N.C. 748, 31 S.E. 847 (1898) (defendant charged with burning a ginhouse; defendant absent during his counsel's closing argument); *State v. Paylor*, 89 N.C. 539 (1883) (defendant, charged with burning a granary and with burning a stable, was absent during closing argument).

that support the harmless error doctrine, the United States Supreme Court in *Chapman* also recognized that some constitutional errors require reversal without regard to the evidence in the particular case, 386 U.S. 18, 23, n.8, 17 L.Ed. 2d 705, 710, n.8 (citing *Payne v. Arkansas*, 356 U.S. 560, 2 L.Ed. 2d 975 (1958)) (introduction of coerced confession); *Gideon v. Wainwright*, 372 U.S. 335, 9 L.Ed. 2d 799 (1963) (complete denial of right to counsel); *Tumey v. Ohio*, 273 U.S. 510, 71 L.Ed. 749 (1927) (adjudication by biased judge). This limitation recognizes that some errors necessarily render a trial fundamentally unfair, *Rose v. Clark*, 478 U.S. at 577, 92 L.Ed. 2d at 470, or protects important values that are unrelated to the truth-seeking function of the trial.[5] However, in review of violations of the criminal defendant's federal constitutional right to be present at critical stages of trial, the United States Supreme Court has rejected a reversible error per se rule and has held that the proper standard requires the prosecution to establish that the error was harmless beyond a reasonable doubt. *Rushen v. Spain*, 464 U.S. 114, 78 L.Ed. 2d 267 (1983).[6] In construing a provision of the state Constitution, we find highly persuasive the meaning given and the approach used by the United States Supreme Court in construing a similar provision of the federal Constitution. *Watch Co. v. Brand Distributors and Watch Co. v. Motor Market*, 285 N.C. 467, 474, 206 S.E. 2d 141, 146 (1974). Accordingly, we hold that the proper standard of reversal in reviewing violations under article I, section 23, of defendant's right to be present at all stages of his capital trial is the rigorous standard prescribed for review of violations of defendant's right to be present at trial under the federal Constitution. *See* N.C.G.S. § 15A-1443(b) (1988). We will order a new trial unless the State proves, and we find, that the error was harmless beyond a reasonable doubt. An error is harmless if "beyond a reasonable doubt . . . [it] did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24, 17 L.Ed.

---

5. *See id.* at 587-88, 92 L.Ed. 2d at 476-77 (Stevens, J., concurring); *Vasquez v. Hiller*, 474 U.S. 254, 262, 88 L.Ed. 2d 598, 608 (1986) (intentional discrimination in the selection of grand jurors); *Batson v. Kentucky*, 476 U.S. 79, 100, 90 L.Ed. 2d 69, 90 (1986) (racial discrimination in the selection of the petit jury); *Payne v. Arkansas*, 356 U.S. 560, 568, 2 L.Ed. 2d 975, 981 (1958) ("coerced confession vitiates the judgment because it violates the Due Process Clause of the Fourteenth Amendment").

6. *See, e.g., Snyder v. Massachusetts*, 291 U.S. 97, 114-18, 78 L.Ed. 674, 682-85 (1934), unless the deprivation, by its very nature, cannot be harmless, *see, e.g., Gideon v. Wainwright*, 372 U.S. 335, 9 L.Ed. 2d 799 (1963).

2d 705, 710 (1967). Insofar as our decisions and the language in our case law are inconsistent with this opinion, they are overruled.

N.C.G.S. § 15A-1443, entitled "Existence and showing of prejudice," consists of three subsections: subsection (c) deals with invited error, and because a non-waiveable right is at issue here, is not applicable; subsection (b) states the standard for reversal in review of violations of the United States Constitution; and subsection (a) states the standard for "errors relating to rights arising other than under the Constitution of the United States."[7] While the General Assembly has no authority to fix the standard for reversal in review of violations of the federal Constitution, it did so in N.C.G.S. § 15A-1443(b) in an apparent attempt to reflect the United States Supreme Court's decision in *Chapman*, 386 U.S. 18, 17 L.Ed. 2d 705. In contrast, the General Assembly made no express attempt to fix the standard for violations of the state Constitution, but by implication, the standard appears to be prescribed by subsection (a), "errors relating to rights arising other than under the Constitution *of the United States*." (Emphasis added.) However, under our constitutional form of government, "[o]nly this Court may authoritatively construe the Constitution of North Carolina with finality," *Lea Co. v. N.C. Board of Transportation*, 308 N.C. 603, 610, 304 S.E. 2d 164, 170 (1983), and it is for this Court, and not for the legislature, to say what standard for reversal should be applied in review of violations of our state Constitution. Accordingly, for the reasons already discussed in this opinion, the proper standard for reversal in reviewing violations of defendant's state constitutional right to be present at his capital trial is the "harmless

---

7. N.C.G.S. § 15A-1443 provides:

(a) A defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. The burden of showing such prejudice under this subsection is upon the defendant. Prejudice also exists in any instance in which it is deemed to exist as a matter of law or error is deemed reversible per se.

(b) A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless.

(c) A defendant is not prejudiced by the granting of relief which he has sought or by error resulting from his own conduct.

beyond a reasonable doubt" standard prescribed in this opinion, and not the standard apparently prescribed in N.C.G.S. § 15A-1443(a).

[6]   Applying this standard to the violation in this case, we find nothing in the record that would lead us to believe that defendant was prejudiced by his absence. First, we note that all proceedings took place in open court. The trial court carefully informed the jury in open court that the defendant was absent at his own request and at the request of his attorneys. The testimony of the State's witnesses was offered in open court. Second, everything that took place is reflected in the record. The court reporter was present and transcribed the events which occurred during defendant's absence. Third, the record shows that defense counsel were in court and participated throughout defendant's absence to protect his interests, and that the trial judge told counsel they could confer with the defendant as to the possibility of his return at any time. Although the members of the jury did not have the opportunity to observe defendant's demeanor during Detective Daws' entire testimony, they were able to observe defendant's distress during the first half of Detective Daws' testimony. The trial court's excusal of defendant from the courtroom at defendant's and defense counsel's request after an attempt to cure the problem by a recess indicates that defendant and counsel did not believe that defendant's distress would pass, or his demeanor change, were he to remain in court for the balance of Detective Daws' testimony. The trial court's action in permitting the defendant to remain absent from the courtroom during Dr. Hudson's testimony, and defendant's and defense counsel's failure to request that defendant return, indicate that they did not believe defendant's distress or demeanor would change during Dr. Hudson's testimony. Neither do we. The State argues, with perhaps some merit, that what defendant could have offered in his emotional state could have been detrimental to the presentation of his case; that had he been required to remain, his attorneys' attention would have been diverted from the State's witness' testimony to their distraught client; and that defendant would not have been able to assist his counsel in defending against the testimony of these two witnesses. Neither Detective Daws nor Dr. Hudson offered surprise testimony; Detective Daws merely read to the jury defendant's own statement. Dr. Hudson testified to his autopsy results. Both the statement and the autopsy report had been made available to the defendant before trial.

Although defendant's absence was error, we believe that the public interests implicated in our strict rule that the defendant be present at every stage of his capital trial were preserved at this trial. The trial judge undertook to perform his duty to assure defendant's presence. He made every effort to be fair to the defendant and to emphasize to all onlookers, to the jury, and to the parties that the defendant was afforded proper safeguards. He recessed the trial to allow the defendant the opportunity to calm himself; he twice instructed the jury that the defendant was absent not on court order but on the request of defendant and his counsel. He made certain that the record reflected that defendant's absence was at his own request and not on court order. He stressed to defense counsel that he would entertain their request to allow defendant to return at any time and that he would recess the court at any time to allow defendant's return to the courtroom. Based on the foregoing analysis and considerations, we conclude that the State has shown that the error was harmless beyond a reasonable doubt. Defendant's assignment of error is overruled.

III.

In defendant's third assignment of error, he contends that the trial court erred in denying his motion to suppress the testimony of the psychiatric evaluation team which examined him at Dix Hospital in August 1986. He contends, in issues of first impression to this Court, that the admission of this evidence violated his right to be free from compulsory self-incrimination and his constitutional right to effective assistance of counsel.

A.    Fifth Amendment

[7]    The first issue raised by the defendant is whether his right to be free from compelled self-incrimination under the fifth amendment of the United States Constitution and article I, section 23 of the North Carolina Constitution was violated by the admission of the treatment team's testimony as to statements made during his second court-ordered psychiatric examination after defendant had introduced expert testimony of insanity.

These are the pertinent facts: After defendant had filed notices on 1 November 1985 of his intent to rely on the insanity defense and of his intent to introduce expert testimony supporting it, on 9 January 1986 the court ordered defendant committed, on the prosecution's motion, to the Forensic Unit of Dorothea Dix Hospital

to determine his mental state at the time of the offenses. Under that order, defendant was examined in January 1986, at Dix Hospital by a treatment team headed by psychiatrist James C. Groce and including psychologist Dorothy Humphrey.

Seven months later, on 19 August 1986, because of defense counsel's questions as to defendant's capacity to proceed to trial set for that month, the court ordered defendant committed to the Forensic Unit at Dix Hospital a second time — this time for examination as to his capacity to proceed to trial pursuant to N.C.G.S. § 15A-1002.[8] On defendant's second admission, the Dix Hospital staff advised defendant that anything he told them could be revealed at trial. However, the form signed by defendant on his second admission also provided that any information relating to his examination would be released by the hospital only on his written authorization. The treatment team examining him included psychiatrist Bob Rollins, psychologist Dorothy Humphrey, and social worker Debbie Keith.

At trial, the defense introduced evidence of defendant's mental state at the time of the two offenses through the testimony of three expert witnesses. Dr. Groce, who had examined defendant upon his first commitment to Dix, testified that defendant suffered from chronic mental illness which he had diagnosed as subchronic paranoid schizophrenia. He believed that when he had examined defendant at Dix Hospital in January 1986, defendant's illness had been in remission, partially as a result of the medication he had been taking. Dr. Groce was not able to form a definitive opinion about defendant's sanity at the time of the crimes and identified several reasons why he could not. First, the symptoms of defendant's illness could have changed in the year since the deaths; second, the antipsychotic medication defendant had been taking would have improved his thinking if he did have a mental illness; and third, the absence of information from objective sources made it impossible to compare defendant's subjective report against objective reports of the same events. No witness was available who could describe defendant's comments and behavior at the time of the deaths. Dr. Groce did believe that defendant's mental illness

8. Judge Giles Clark's order of 19 August 1986 was not included in the record on appeal submitted by the parties. A third order, entered on 14 January 1987 by Judge Coy E. Brewer, Jr., was mistakenly included in support of this assignment of error.

was causing symptoms sufficient to impair his thinking at the time of the deaths and that the medication had since improved his thinking.

Dr. Brad Fisher, a clinical psychologist, examined defendant within ten days of the crimes and again about six months later. He testified that defendant suffered from paranoid schizophrenia typified by delusional thinking. In the areas where defendant had deluded thinking—on the subjects of his mother-in-law, his son, his wife and their interconnections—defendant was severely limited in his ability to differentiate right from wrong.

Dr. Selwyn Rose, a psychiatrist, had examined defendant for the first time nine days after his arrest and had interviewed him quarterly for the two-and-one-half-year period before trial. In December 1985, he had placed defendant on medication to treat his illness, which he had diagnosed as paranoid schizophrenia. Dr. Rose testified that since defendant's illness made him incapable of rational thinking, he was also incapable of premeditating and deliberating the deaths of his son and mother-in-law. Because of the severity of defendant's mental illness, he was unable at the time of the crimes to understand the difference between right and wrong or to understand the nature and quality of his actions.

All three experts testified that defendant killed his son and his mother-in-law during a single psychotic break.

Defendant did not testify.

To rebut defendant's expert testimony, the prosecution called three members of the treatment team that had examined defendant at Dorothea Dix Hospital in August 1986 during his second court-ordered commitment: psychologist Dorothy Humphrey, psychiatrist Bob Rollins, and social worker Debbie Keith. On the basis of their examination of defendant in August-September 1986, both Humphrey and Rollins testified that defendant had a personality disorder with schizotypal features. Dr. Rollins did not believe that defendant was or had been suffering from paranoid schizophrenia, as defendant's experts had testified. Both testified that defendant probably knew the nature and quality of his act when he buried his son and that he knew the difference between right and wrong as to his act of burying his son and of shooting his mother-in-law. Ms. Humphrey had administered but had discounted the results of the Minnesota Multiphasic Personality Inventory (MMPI) administered to defendant because a validity scale for scoring defendant's

responses indicated they were not accurate measures of his condition. Dr. Rollins also found that defendant was depressed. Debbie Keith testified that she had gathered data for the psychiatrist's use in evaluating the defendant.

The effect of this expert testimony offered by the prosecution was to rebut defendant's evidence of insanity presented through defendant's experts' testimony.

Defendant contends that under *Estelle v. Smith*, 451 U.S. 454, 68 L.Ed. 2d 359 (1981), the treatment team's testimony resulting from the second court-ordered examination was inadmissible unless the personnel at Dix had advised defendant of his *Miranda* rights, specifically, that he had a right to remain silent and that anything he said could and would be used against him in court. *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694 (1966).

The Dorothea Dix admission form which defendant signed is not included in the record on appeal before us. The witness Dr. Rollins was asked to read from the form on both direct and cross-examination, and he did so as follows:

MR. VANSTORY: Sir, what is the standard procedure employed at Dorothea Dix for advising patients of confidentiality?

. . . .

THE WITNESS [DR. ROLLINS]: The patient is informed by the technician admitting the patient of the applicable standard and the patient is asked to sign acknowledgment at that time that that has been done, and additionally, it is done by the physician.

. . . .

A I explained to Mr. Huff the confidentiality.

Q What did you tell him in that regard, sir?

A I explained that he had been sent here by his attorney, and that if I was called to testify in court, anything he told me could be revealed.

. . . .

Q Is there a form in Everett Randolph Huff's file indicating that he was talked to by such technician?

A Yes. There is a form for each admission.

Q What does the form say, sir?

A "Any information we obtain by you may be revealed in court. You do not have to answer any questions or reveal any information. Members of our staff may be called as witnesses in court by either your attorney or the District Attorney. We may or may not give the court an opinion about your mental responsibility at the time of the alleged crime, depending upon available information. We may try to answer any questions raised by your attorney or the District Attorney. We sometimes are asked to make specific recommendations to the court about the disposition of your case, and future medical treatment. Usually, our findings deal with the capacity to proceed and responsibility at the time of the alleged crime, render an opinion [if] possible, among other unrelated issues." (sic)

Q And is there a place for a person after being so advised to acknowledge his understanding of that?

A Yes, sir.

Q Do you see the signature of Everett Randolph Huff?

A Yes, sir.

. . . .

MR. VANSTORY: And when you say, for each admission, how many admissions are you talking about?

A Three.

Q What are the dates of them?

. . . .

THE WITNESS: . . . The first is January the 14th, 1986. The second is August the 15th, 1986. And the third is January 15, 1987. . . .

. . . .

Q All right. Let me put this to you. Do you see anywhere on that form or forms where it says the clients are advised information will be disclosed only upon the client's written authorization?

A Yes. It says, ". . . have no unauthorized publicity on or use of your treatment records. Your treatment records are deemed confidential and may be disclosed only upon a written request for release by you."

Q And that was related to Everett Randolph Huff on each of his admissions?

A Yes, sir.

Defendant contends (1) that the second examining team did not formally advise defendant of his rights but instead advised him only that anything he told them could be revealed at trial, (2) that the form he signed informed him that information gathered during the examination was confidential and would be released only on his written authorization, and (3) that their testimony as to information defendant related to them during his second evaluation was obtained in violation of his right to be free of compelled self-incrimination. While we disagree with defendant's characterization of this evidence, more importantly we disagree with his conclusion.

We do not find *Smith*, 451 U.S. 454, 68 L.Ed. 2d 359, controlling. In *Smith*, defendant was ordered to undergo a psychiatric examination to determine his competency to stand trial for first-degree murder. He was found competent, tried by a jury, and convicted. At the capital sentencing hearing the psychiatrist who had conducted the competency examination testified for the State of Texas. Based on the court-ordered competency examination, he stated that defendant would pose a future threat to society. The jury resolved the issue of future dangerousness against the defendant (as well as two other issues), which under Texas law made the death penalty mandatory. On appeal, the United States Supreme Court held that the admission of the doctor's testimony violated defendant's fifth amendment privilege against compelled self-incrimination because defendant was not advised before the court-ordered psychiatric examination that he had a right to remain silent and that any statement he made could be used against him at a capital-sentencing proceeding.

This case is materially different on its facts. In *Smith*, the defendant had not placed his sanity in issue; here, unlike *Smith*, defendant had given notice of his intent to assert the insanity defense and to rely on expert testimony to support it. Furthermore,

STATE v. HUFF

[325 N.C. 1 (1989)]

the Supreme Court expressly distinguished *Smith* from a case such as this one:

> Nor was the interview analogous to a sanity examination occasioned by a defendant's plea of not guilty by reason of insanity at the time of his offense. When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case. Accordingly, several Courts of Appeals have held that, under such circumstances, a defendant can be required to submit to a sanity examination conducted by the prosecution's psychiatrist.

*Estelle v. Smith*, 451 U.S. at 465, 68 L.Ed. 2d at 370. Moreover, the Supreme Court's holding was specifically limited to account for these factual differences: "A criminal defendant, *who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence*, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." *Id.* at 468, 68 L.Ed. 2d at 372 (emphasis added). Accordingly, we conclude that if *Smith* has any bearing upon this case, it is that its dicta suggest that defendant has no fifth amendment protection in these circumstances.

A number of federal circuit courts have considered the issue. *See United States v. Byers*, 740 F. 2d 1104, 1111 (D.C. Cir. 1984) (plurality), and cases cited therein. They have uniformly, though admittedly for different reasons, held that no fifth amendment violation occurs where the defendant is compelled to undergo a psychiatric examination by the State after pleading insanity.

In *Byers*, Judge (now Justice) Scalia, writing for the D.C. Circuit Court of Appeals, examined the four rationales relied upon by the federal circuit courts: (1) waiver, (2) nontestimonial nature of the evidence, (3) estoppel, (4) evidence admitted to show only insanity (as opposed to guilt) is not covered by the privilege against self-incrimination. The waiver rationale finds that a defendant "waives" the fifth amendment protection by voluntarily making psychiatric evaluation an issue in the case. The nontestimonial evidence rationale characterizes the psychiatric interview as "real or physical" evidence which is neither a "communication" nor "testimony" and, therefore, unprotected by the privilege against self-incrimination. The estoppel rationale finds that defendant's im-

plicit reliance upon the theory that statements made in psychiatric examinations are "real or physical evidence" in order to have his expert's testimony received despite the hearsay rule creates an estoppel against his objection to the Government's reliance upon the "real or physical evidence" theory to overcome the fifth amendment bar. The final rationale defines the scope of the privilege against self-incrimination narrowly, reaching only statements introduced to show that the defendant actually committed the offense in question, but not statements brought in on the issue of sanity.

After declining to rely on any of these four rationales, the D.C. Circuit concluded that the courts advancing them intended them as "devices . . . for weaving *a result demanded on policy grounds* unobtrusively into the fabric of the law." *Id.* (emphasis added). They have, declared the D.C. Circuit, denied the fifth amendment claim primarily because of "the unreasonable and debilitating effect it would have upon society's conduct of a fair inquiry into the defendant's culpability." *Id.* The reason for rejecting the fifth amendment argument appears to be based purely on the practical need to rebut defendant's experts' evidence of insanity. Expert testimony is so uniquely impressive upon jurors that it needs to be rebutted by evidence from experts. This policy has been described as the need to strike a " 'fair state-individual balance' (one of the values underlying the Fifth Amendment set forth in *Murphy v. Waterfront Commission*, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed. 2d 678[, 681] (1964) )," *id.*, as a matter of "fundamental fairness," *id.*, and as a matter of "judicial common sense." *Id.* As the court said in *Pope*:

> It would be a strange situation, indeed, if, first, the government is to be compelled to afford the defense ample psychiatric service and evidence at government expense and, second if the government is to have the burden of proof, . . . and yet it is to be denied the opportunity to have its own corresponding and verifying examination, a step which perhaps is the most trustworthy means of attempting to meet that burden.

*Pope v. United States*, 372 F. 2d at 720, *quoted in United States v. Byers*, 740 F. 2d at 1113.

For this reason alone, the D.C. Circuit in *Byers* held that when "a defendant raises the defense of insanity, he may constitutionally be subjected to compulsory examination by court-appointed or government psychiatrists . . . ; and when he introduces into

evidence psychiatric testimony to support his insanity defense, testimony of those examining psychiatrists may be received . . . as well." *United States v. Byers*, 740 F. 2d at 1115.

Citing *Byers*, the United States Supreme Court has since approved the introduction of psychological reports based on defendant's mental examination if the report is introduced for the purpose of rebutting defendant's mental defense. *Buchanan v. Kentucky*, 483 U.S. 402, 97 L.Ed. 2d 336, *reh'g or modification denied*, 483 U.S. 1044, 97 L.Ed. 2d 807 (1987). The Court stated that "if a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested." *Id.* at 422-23, 97 L.Ed. 2d at 355.

In *Buchanan*, defendant was attempting to establish a mental defense. Defendant did not testify. His only witness was a social worker who read from psychological reports completed after an examination following a previous arrest. On cross-examination the prosecutor attempted to rebut the testimony by having the social worker read from a psychological report prepared on examination after a joint motion for involuntary civil commitment following the murder for which defendant was being tried.

The facts in *Buchanan* differ only slightly from the case at bar. The defendant here, as in *Buchanan*, has placed his mental status in issue by introducing expert testimony on his mental status. The prosecution has no way to rebut the defense unless it too may introduce expert testimony on defendant's mental status. As in *Buchanan*, the expert testimony here reported the experts' observations about defendant's mental state but did not describe any statements defendant made about the crimes with which defendant was charged.

Accordingly, for the reasons made clear in the D.C. Circuit's analysis in *Byers*, and approved by the United States Supreme Court in *Buchanan*, we hold that when a defendant relies on the insanity defense and introduces expert testimony on his mental status, the prosecution may introduce expert testimony derived from prior court-ordered psychiatric examinations for the purpose of rebutting that testimony without implicating the fifth amendment of the United States Constitution or article I, section 23 of the North Carolina Constitution.

## STATE v. HUFF

[325 N.C. 1 (1989)]

The North Carolina Court of Appeals addressed similar issues in *State v. Jackson*, 77 N.C. App. 491, 335 S.E. 2d 903 (1985), which did not reach this Court. Though the result reached by the Court of Appeals was correct, certain rationales employed in that decision have been rejected by the United States Supreme Court and now by this Court.[9]

---

9. In *Jackson*, 77 N.C. App. 491, 335 S.E. 2d 903, defendant gave notice of his intent to rely on the insanity defense and to introduce expert testimony to support it. On defendant's motion, the court ordered that a psychiatrist be paid to examine the defendant as to his sanity at the time of the offense. On the State's motions, the superior court issued two substantially identical orders, each for psychiatric examination to determine defendant's competency and his sanity at the time of the offenses. The testimony of psychiatric experts for the defense and for the State was admitted at trial.

The defendant first argued that the superior court orders directing the psychiatric examination as to defendant's sanity at the time of the offense exceeded the superior court's statutory authority. The defendant did not raise a fifth amendment claim on this issue.

In *Jackson*, the Court of Appeals properly concluded that if a defendant gives notice of his intent to assert the insanity defense that it is "not only reasonable, but necessary, that the prosecution be permitted to obtain" its own psychiatric examination of the defendant. *Id.* at 498, 335 S.E. 2d at 907. Otherwise, the State would be unable to "discover fraudulent mental defenses or [to] offer expert psychiatric testimony to rebut the defendant's evidence." *Id.* The Court of Appeals also properly held that if the defendant has placed his sanity at issue the trial court has the authority as part of its power to oversee the proper administration of justice to order a psychiatric exam. *Id.* at 498, 335 S.E. 2d at 907-08.

The defendant also raised the issue now before us: whether under *Estelle v. Smith*, 451 U.S. 454, 68 L.Ed. 2d 359, the admission of testimony by the State psychiatrist as to defendant's statements during the exam and of the opinions based on those statements violated defendant's fifth amendment right against self-incrimination when defendant has introduced psychiatric testimony on his sanity. *State v. Jackson*, 77 N.C. App. at 498, 335 S.E. 2d at 908.

The Court of Appeals first concluded that because *Smith* was materially different on its facts, it did not control. The panel then held that by defendant's introduction of psychiatric testimony to information obtained during his examination, defendant waived his right under the fifth amendment to exclude the State psychiatrist's testimony to information during defendant's court-ordered examination.

We agree with the Court of Appeals that Jackson's own introduction of psychiatric testimony distinguishes his case from *Smith*. However, for the reasons articulated by Judge Scalia in *Byers*, 740 F. 2d at 1109-15, we conclude that the fifth amendment protection against self-incrimination does not extend to psychiatric testimony introduced to rebut defendant's expert psychiatric testimony — not because he waived that right, but because judicial balance and fundamental fairness compel this result.

The Court of Appeals also concluded that the admission of the State psychiatrist's testimony was not error. The court reasoned that the fifth amendment barred

[8] Defendant further argues that the prosecution had a fair opportunity to rebut any psychiatric testimony offered by defendant from information developed during the first court-ordered evaluation. We do not agree that the first psychiatric examination of defendant necessarily afforded the prosecution a "fair opportunity" to rebut defendant's insanity defense. The conclusions of any mental health expert, his diagnoses and postdictions, are only as reliable as the data on which those conclusions are based. If there is reason to believe that defendant's evaluation was based on incomplete or distorted data, then there is good reason to reevaluate the individual in light of more complete or more accurate data. The skill of the clinician interpreting the raw data can also affect the validity of a diagnosis or other clinical judgment. Furthermore, retesting is often useful in defining the parameters of a mental illness. Although the underlying condition may always be present, the mental illness may over time manifest itself with symptoms of varying intensity. Knowing the parameters of the illness may increase the reliability of an expert's postdictions about a defendant's mental condition.

Sound reasons existed in this case for a second evaluation of defendant's mental status. Testimony from the experts who examined defendant the first time acknowledged the limitations of that examination. Dr. Groce was uncertain what effect defendant's medication had had on defendant's condition. He testified that he could not confidently say if defendant knew the difference between right and wrong when he killed Crigger Huff and Gail Strickland because he lacked objective data against which to compare defendant's reports of the events. Ms. Humphrey discounted the results of the Minnesota Multiphasic Personality Inventory (MMPI) administered to defendant because a validity scale for scoring defendant's responses indicated they were not accurate measures of his condition. There was also reason to believe that a second evaluation would be helpful in defining the parameters of defendant's illness since the character of his thinking had changed since the first

---

the admission of defendant's statements to establish guilt; it did not extend to statements admitted as the basis of the psychiatrist's opinion of defendant's sanity; since the trial court instructed the jury to consider the testimony only to the extent that it tended to establish sanity, there was no error. This rationale was implicitly rejected in *Smith*, 451 U.S. at 462-63, 68 L.Ed. 2d at 368-69. *United States v. Byers*, 740 F. 2d at 1112-13. For that reason, we also reject it as a basis for the admission of the State's psychiatric testimony.

evaluation at Dix: defendant's expert, Dr. Rose, who had been seeing defendant quarterly, stated in his affidavit supporting counsel's motion to commit defendant to Dix Hospital that "the stress of the impending trial and other factors including suicidal ideation, have led to an acute deterioration of his mental condition." More information about the parameters of defendant's illness could have increased the reliability of the expert's postdictions about defendant's sanity at the time of the offenses. Given the sound reasons for reevaluation generally, and in this case, we conclude that a fair opportunity to rebut may include more than one examination of the defendant.

## B. Sixth Amendment

[9] Defendant also argues that his right to effective assistance of counsel under the sixth amendment to the United States Constitution and under article I, section 23 of the North Carolina Constitution was violated by the admission of the second treatment team's testimony as to information obtained during his second court-ordered psychiatric examination because that admission was for the purpose of determining his capacity to proceed, as opposed to his sanity at the time of the crime.

The sixth amendment, made applicable to the states through the fourteenth amendment, provides that "[i]n all criminal prosecutions the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. Article I, section 23, the parallel provision in the North Carolina Constitution, contains similar language. Our interpretation of the state provision has generally tracked the United States Supreme Court's interpretation of the federal provision.

This "right to counsel granted by the Sixth Amendment means that a person is entitled to the help of a lawyer 'at or after the time that adversary judicial proceedings have been initiated against him . . . whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' *Kirby v. Illinois*, 406 U.S. 682, 688-698 (1972) (plurality opinion); *Moore v. Illinois*, 434 U.S. 220, 226-229 (1977)." *Estelle v. Smith*, 451 U.S. 454, 469-70, 68 L.Ed. 2d 359, 373. In addition, the sixth amendment insures that the accused "need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial."

*United States v. Wade*, 388 U.S. at 226-27, 18 L.Ed. 2d at 1157, *quoted in Estelle v. Smith*, 451 U.S. at 470, 68 L.Ed. 2d at 373.

In *Estelle v. Smith*, 451 U.S. 454, 68 L.Ed. 2d 359, the United States Supreme Court also held that the sixth amendment was violated by the State's introduction of a psychiatrist's testimony at the penalty phase of defendant's trial. The defendant had not placed his mental state in issue and his attorney had neither been informed that the order for psychiatric examination had been entered nor did he have notice that the scope of the examination would include a determination of defendant's future dangerousness.

Although defendant asserts that *Smith* controls the outcome in this case, we disagree. Instead, we find that *Buchanan v. Kentucky*, 483 U.S. 402, 97 L.Ed. 2d 336, also states the principles that control our sixth amendment analysis. The defendant in *Buchanan* argued that his right to counsel had been violated under *Estelle v. Smith*, 451 U.S. 455, 68 L.Ed. 2d 359, by the admission of this report. However, the Court held that no right to counsel violation had occurred, and that the fact situation presented in *Smith* was critically different from that presented in *Buchanan*. "In *Smith*, defendant had not received the opportunity to discuss with his counsel the examination or its scope." *Buchanan v. Kentucky*, 483 U.S. at 424, 97 L.Ed. 2d at 356. In contrast, in *Buchanan*, defendant had the opportunity to discuss with counsel the nature of a psychiatric examination; in fact, "counsel himself requested the psychiatric evaluation by . . . [the psychiatrist]." *Id.* In *Buchanan*, the Court said, "It can be assumed—and there are no allegations to the contrary—that defense counsel consulted with petitioner about the nature of this examination." *Id.*

The defendant argues, as the defendant did in *Buchanan*, that he was denied effective assistance of counsel because counsel did not anticipate that the examination results might be used to rebut his insanity defense. The Supreme Court rejected Buchanan's argument, stating that "the proper concern of this [Sixth] Amendment" does not focus on the potential uses to which the prosecution might put the psychiatric report but on "the consultation with counsel. . . . Such consultation [with counsel], to be effective, must be based on counsel's being informed about the scope and nature of the proceeding [referring to defendant's examination]. . . . To be sure, the effectiveness of the consultation [between defendant and attorney] also would depend on counsel's awareness of the possible

uses to which petitioner's statements in the proceeding could be put." *Buchanan v. Kentucky*, 483 U.S. at 424-25, 97 L.Ed. 2d at 357. The Court concluded, "Given our decision in *Smith*, however, counsel was certainly on notice that if, as appears to be the case, he intended to put on a 'mental status' defense . . . , he would have to anticipate the use of psychological evidence by the prosecution in rebuttal." *Id.* at 425, 97 L.Ed. 2d at 357 (footnote omitted).

Turning to the case before us, we conclude that defendant had the opportunity to discuss with his lawyer whether or not to submit to the second court-ordered examination and to discuss its scope as well. As in *Buchanan*, there are no allegations that defendant did not have the opportunity to talk with his lawyer about whether to submit to the examination. Furthermore, under the decision of the Court of Appeals in *State v. Jackson*, 77 N.C. App. 491, 335 S.E. 2d 903, defendant was on notice that by placing his sanity at issue, the State was empowered to order its own examination and that the scope of that examination would include forming the basis to rebut his insanity defense. The absence of express language in the second order specifying defendant's examination to determine his mental state at the time of the offenses is not significant under the Supreme Court's decision in *Buchanan*. Under these circumstances, we conclude that there was no violation of the state and federal guarantees of effective assistance of counsel.

IV.

Fourth, defendant assigns as error the instructions to the jury during the guilt determination phase of the trial. First, he contends that the trial court's instructions could reasonably be understood by a juror to permit a joint determination of guilt on the two murder charges; second, and following from the first, he asserts that the trial court's failure in a capital trial to instruct the jury to consider separately the defendant's guilt or innocence on each charge is prejudicial per se. Defendant contends that the effect of these two alleged errors was to relieve the State of its burden of proof as to each offense, and so to violate his rights. We disagree.

The specific rights defendant contends he was denied are the right to due process under the fifth and fourteenth amendments of the United States Constitution and under article I, sections 18 and 19 of the North Carolina Constitution and the right to be free from cruel and unusual punishment under the eighth amend-

ment of the United States Constitution and under article I, section 27 of the North Carolina Constitution. We disagree.

Article I, section 19 of the North Carolina Constitution and the fifth and fourteenth amendments of the United States Constitution secure for the criminal defendant the right to due process of law. *State v. Patton*, 260 N.C. 359, 132 S.E. 2d 891 (1963). The concept of due process affords the defendant certain procedural protections, among them the guarantee that he may not be convicted except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *In re Winship*, 397 U.S. 358, 364, 25 L.Ed. 2d 368, 375 (1970); *State v. Mize*, 315 N.C. 285, 292-94, 337 S.E. 2d 562, 567 (1985). The due process clause of the fifth amendment protects individuals from due process violations by the federal government, *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 467, 91 L.Ed. 422, 428 (1947), and the fourteenth amendment through its due process clause protects them against due process violations by the states, *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 91 L.Ed. 422. In capital trials, the concept of due process also implicates defendant's right to be free from cruel and unusual punishment. *Id.* at 463, 473-74, 91 L.Ed. at 426, 431-32 (Burton, J., dissenting). The prohibition against cruel and unusual punishment embodied in the eighth amendment is made applicable to the states through the due process clause of the fourteenth amendment. *Robinson v. California*, 370 U.S. 660, 8 L.Ed. 2d 758 (1962).

It is the responsibility of the trial court to instruct the jury on the burden which the prosecution must carry. *Davis v. United States*, 160 U.S. 469, 488, 40 L.Ed. 499, 506 (1895); *State v. Mize*, 315 N.C. at 292, 337 S.E. 2d at 567. *See also* N.C.G.S. §§ 15A-1231, -1232 (1988). If we find on appeal that a juror could reasonably have construed the trial judge's instructions to permit the jury to convict without proof beyond a reasonable doubt of every element necessary to constitute the crime with which a defendant is charged, then we must set the verdict aside as an unconstitutional violation of his due process rights. *Sandstrom v. Montana*, 442 U.S. 510, 61 L.Ed. 2d 39 (1979). The trial court's instructions are taken as a whole. *State v. Davis*, 321 N.C. 52, 59, 361 S.E. 2d 724, 728 (1987).

[10]   The due process clause of the fifth amendment of the United States Constitution provides that "[n]o person shall be . . . deprived

of life, liberty, or property, without due process of law." As part of the first eight amendments to the United States Constitution, it protects individuals only against due process violations by the federal government. *Louisiana ex rel. Francis v. Resweber*, 329 U.S. at 467, 91 L.Ed. at 428. However, the federal government has had no involvement in defendant's prosecution in state court for state crimes on state indictments. For that reason, defendant's claim that this jury instruction violates the fifth amendment of the federal Constitution is without merit and is overruled.[10]

Defendant contends that these jury instructions violate article I, section 18 of the North Carolina Constitution. Article I, section 18 of the North Carolina Constitution provides in pertinent part that "every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law." This constitutional provision generally guarantees access to the courts for redress of civil wrongs. *See Bolick v. Barmag Corp.*, 54 N.C. App. 589, 284 S.E. 2d 188 (1981), *aff'd*, 306 N.C. 364, 293 S.E. 2d 415 (1983). Defendant does not explain how this guarantee has been violated, and so we do not address his claim.

Defendant also contends that these jury instructions violate the due process clause of the fourteenth amendment of the United States Constitution and its parallel provision, article I, section 19 of the North Carolina Constitution. Since defendant was being tried on two charges, he objects specifically to various instructions which refer to a single victim, a single case, or a single decision to be made. These references in the singular were misleading, he contends, and could have led a juror to believe that a juror is permitted to make a joint determination of guilt. Defendant argues that, on occasion, the trial judge referred to a single "victim," although there were two victims; that he said that the State has the burden of "proving the case," although there were two cases for the State to prove; and that he instructed the jury that the "decision in the case must be unanimous," although the jury was required to make two decisions, one in each of *two* cases. Defendant also assigns as error the giving of a single joint instruction on insanity.[11] He

---

10. Defendant has asserted violations of the due process clause of the fifth amendment in the following assignments of error: I, IV, VII, VIII, IX, X, XI, XII, as well as in all preservation issues. For the reasons stated above, these assignments of error are also without merit.

11. *[I]n this case*, you will consider *evidence that the Defendant was legally insane at the time of the alleged offenses* only if you find that the State

also identifies points in the jury instructions at which a clarifying instruction could appropriately have been given.

**[11]**  Defendant did not object at trial to the instructions which he now assigns as error. As a result, we find that he has waived his right to appellate review of the question except under the "plain error" standard set forth in *State v. Odom*, 307 N.C. 655, 300 S.E. 2d 375 (1983).[12] After thoroughly reviewing the instructions for plain error, we find none.

**[12]**  There is a danger in any trial in which offenses are joined that the jury will convict by cumulating the charges or by cumulating the evidence. The trial judge did not specifically instruct the jurors to consider each charge separately. However, the instructions which he did give achieved that result; taken as a whole, they make clear that in the determination of defendant's guilt or innocence the jury was to consider each charge separately.

At the beginning of the charge to the jury, the trial judge established the context in which each juror was to understand the subsequent instructions: he instructed them that the defendant had pled not guilty to *two* counts of first-degree murder. He proceeded to instruct the jury as to the verdicts it would be permitted to return on each of these two counts. A second time he stated that the "defendant has been accused of *two* charges of first degree murder." (Emphasis added.) He then referred to *both* cases and treated them as independent entities. He said, "it is your duty *in each case* to return one of the following verdicts." (Emphasis added.) The implication was clear that one verdict in each case was required.

The trial judge proceeded to the instruction on first-degree murder. He instructed on the first element, an intentional killing by the defendant of the victim with malice. After giving the general instruction which applied to both cases, he specifically referred to the Gail Strickland case and gave the specific instruction which

---

has proved beyond a reasonable doubt each of the things about which I have already instructed you.

(Emphasis added.)

12. Under the "plain error" doctrine, the appellate court may review a "grave error which amounts to a denial of a fundamental right of the accused," which has otherwise not been preserved for review. *Id.* at 660, 300 S.E. 2d at 378 (citation omitted).

applied only in the shooting death (the inferences a jury is permitted when a deadly weapon is used). He said, "In your consideration of the case in which Gail Strickland is the victim . . . ." By referring to the Gail Strickland case by name, he distinguished it from the case in which Crigger Huff was the victim and indicated that the jury should consider the evidence of the Gail Strickland case separately from the evidence in the Crigger Huff case.

In the jury instruction on premeditation and deliberation, the fifth element of first-degree murder, the trial judge indicated that each case was to be considered separately. He said, "in determining *in each case* whether the state has proven the existence of these elements." (Emphasis added.) In conclusion, he said, "If you find no specific intent *in either case*, you may not find this defendant guilty of first degree murder *in that case.*" (Emphasis added.)

The trial judge then gave his instruction on the insanity defense. His instruction tracked the language in the pattern instruction on insanity.[13] The pattern instruction is tailored for the trial of a single offense. It provides that the defendant must be insane at the time of the alleged "offense" (in the singular) and repeatedly refers to a single offense. Initially, the trial judge adapted the pattern instruction and instructed the jury: "in this case [in the singular] you will consider evidence that the defendant was insane at the time of the alleged offenses [in the plural]." He then returned to the language of the pattern instruction which referred to a single offense. The defendant contends that the trial judge erred both by altering the instruction as he did and by failing to alter the instruction more radically to fit the trial of joined offenses. We disagree. The insanity instruction, considered in the context of the jury instructions as a whole, indicates that the jury was instructed to consider defendant's insanity as to each separate offense.

Finally, the trial judge described the contents of the verdict sheet to the jury. He said,

On the verdict sheet will be a list of the alternative verdicts in each of the cases, which are as follows: As to Count Number One, case in which the alleged victim is Crigger S. Huff, the following possible verdicts: guilty of first-degree murder, or guilty of second-degree murder, or not guilty . . . . As to

---

13. N.C.P.I.—Crim. 304.10 (Replacement April 1986).

Count Number Two, in which the alleged victim is Gail S. Strickland, the following possible verdicts: guilty of first-degree murder, or guilty of second degree murder, or not guilty.

The format of the verdict sheet and the trial judge's instruction describing it are additional evidence that the instructions as a whole made clear that the jury was to consider each charge separately. The record on appeal shows that the verdict form lists each charge separately and states the permitted verdicts under each charge. This separate treatment clearly requires that the two charges be addressed separately.

In summary, the instructions and mandates of the trial court in this case as a whole indicate that the jury was to consider each charge separately. Accordingly, we find no plain error.

We conclude that the guilt phase of defendant's trial was fair and free of prejudicial error.

SENTENCING PHASE

V.

[13] In his fifth assignment of error defendant argues that the trial court erred in submitting the aggravating circumstance "especially heinous, atrocious or cruel," N.C.G.S. § 15A-2000(e)(9) (1988), in the murder of Crigger Huff. Defendant contends that the submission of this aggravating circumstance to the jury was constitutional error because N.C.G.S. § 15A-2000(e)(9) as construed by our Court and applied in this case failed to inform jurors adequately what facts are sufficient to find that the circumstance exists, and therefore allowed them the unguided discretion prohibited in capital cases by the guarantees against cruel and unusual punishment. Defendant's argument is without merit.

We recently considered the same issue in State v. Fullwood, 323 N.C. 371, 399-400, 373 S.E. 2d 518, 535 (1988). In that case, we concluded that the sentencing instruction given accorded with our construction of "especially heinous, atrocious, or cruel," and that our construction properly limited the exercise of the sentencer's discretion in the manner approved by the Supreme Court in Proffitt v. Florida, 428 U.S. 242, 49 L.Ed. 2d 913 (1976).

We approved the following sentencing instruction in Fullwood, 323 N.C. at 400, 373 S.E. 2d at 535: "For this murder to have been especially heinous, atrocious or cruel, any brutality which was

involved in it must have exceeded that which is normally present in any killing. *This murder must have been a consciencelessness [sic] or pitiless crime which was unnecessarily torturous to the victim.*"

The sentencing instruction in the case before us is virtually identical to the one approved in *Fullwood*, and contains the limiting construction of the aggravating circumstance approved in *Fullwood*. The trial court in this case instructed the jury as follows:

> However, it is not enough that this murder be heinous, atrocious or cruel as those terms have just been defined. This murder must have been especially heinous, atrocious or cruel, and not every murder is especially so.
>
> For this murder to have been especially heinous, atrocious or cruel, any brutality which was involved in it must have exceeded that which is normally present in any case. This murder must have been a conscious [sic] and pitiless crime which was unnecessarily torturous to the victim.

We thus hold that under *State v. Fullwood*, 323 N.C. at 399-400, 373 S.E. 2d at 535, the instruction on the "especially heinous, atrocious, or cruel" aggravating circumstance here properly informed the jurors of the type and quality of facts that are sufficient to find that the circumstance exists.

[14]  Defendant also argues that the trial court erred in submitting the aggravating circumstance of "especially heinous, atrocious or cruel" because the facts of the case do not support its submission. Neither do we find merit in this argument.

In determining if there is sufficient evidence to submit an aggravating circumstance to the jury, the trial judge must consider the evidence in the light most favorable to the State. *State v. Moose*, 310 N.C. 482, 313 S.E. 2d 507 (1984).

In construing this statute, this Court has said that "a finding that this aggravating circumstance exists is only permissible when the level of brutality involved exceeds that normally found in first degree murder or when the first degree murder in question was conscienceless, pitiless, or unnecessarily torturous to the victim." *State v. Hamlet*, 312 N.C. 162, 175, 321 S.E. 2d 837, 846 (1984).

Applying these rules to the case before us, we conclude that the evidence, viewed in the light most favorable to the State,

tended to establish that the killing of the infant Crigger was conscienceless, pitiless, and unnecessarily torturous to the victim. The facts tend to establish that the killing was both conscienceless and pitiless. Crigger Huff died by suffocation after defendant, the child's father and primary caregiver, buried the nine-month-old infant alive. Defendant's killing of his own child in this manner violates the unique bond parents feel for their own children and is a denial of the normal parental need to protect one's own children. Distinct from the violation of the parental relationship, the killing betrays the trust that a baby has for its primary caregiver.

The evidence also supports a finding that the killing was unnecessarily torturous to the baby. Although Dr. Hudson acknowledged that the lack of sand in Crigger's mouth and nose could indicate that death could have occurred quickly, he also noted that the baby's hand, found placed over his mouth, could have prevented sand from entering the child's mouth and nose. Thus, viewed most favorably to the State, the evidence tends to show that the infant was struggling for his life while suffocating in the earthen grave. It is reasonable to infer that the child experienced extreme physical and psychological torture immediately before his death.

[15] Defendant also argues that the age of the victim was improperly considered in determining if the killing was "especially heinous, atrocious or cruel." We do not agree. This Court rejected a similar argument in State v. Zuniga, 320 N.C. 233, 357 S.E. 2d 898 (1987). There the victim of a rape and murder was a seven-year-old child. Defendant was convicted, and as the sole aggravating circumstance the jury found that the murder was committed during the rape. Defendant was sentenced to death. On appeal, Zuniga argued that the brutality of the crime could not be used to compare it to other crimes in the proportionality pool where the especially heinous, atrocious, or cruel factor was found by the jury. Rejecting this claim, the Court noted that although the brutality of the murder was not presented in aggravation, the brutality of the rape could be considered. Moreover, the Court stated, "[L]ikewise, the jury could properly have found that the age of the victim of the rape gave added weight to the factor submitted." Id. at 275, 357 S.E. 2d at 924. The same reasoning applies here. The jury could properly consider the age of Crigger Huff in determining the weight of the aggravating circumstance that the act was especially heinous, atrocious or cruel.

Thus, we hold that the evidence was sufficient for the trial court to submit the aggravating circumstance of especially heinous, atrocious, or cruel.

## VI.

[16] In defendant's sixth assignment of error, he contends that the trial court erred in instructing the jury as to the meaning of "mitigating circumstances." This error, he contends, denied him due process of law, equal protection under the laws, and his right to be free from cruel and unusual punishment under the appropriate federal and state constitutional provisions. We disagree.

The defendant asserts that the instruction was confusing because in the first paragraph the trial court used the term "best deserving" of the death penalty and in the second paragraph it used the term "less deserving." The trial court gave this instruction:

A mitigating circumstance is a fact or group of facts which do not constitute a justification or excuse for a killing or reduce it to a lesser degree of crime than first-degree murder, which may be considered as extenuating, reducing the moral culpability of the case, and making it *best deserving* of the extreme punishment than other first-degree murders.

A mitigating circumstance is also any fact or set of facts relating to the Defendant's age, character, education, environment, habit and mentality and other aspects of the Defendant's life, which may be considered extenuating and reducing the moral culpability of the killing or making the Defendant *less deserving* of the extreme punishment of death than other persons who have committed aggravated first-degree murder.

(Emphasis added.)

Defense counsel acknowledge that they do not know whether the instruction was accurately transcribed by the court reporter or whether the instruction was given as it reads. In either case, they contend, these conflicting instructions on a material feature of the case entitle defendant to a new sentencing hearing. We do not agree.

First, we consider the standard for our review. Defendant did not object at trial to these instructions or seek a correction. Where defendant has taken no action during trial to preserve an error for our review, he has the burden on appeal to show that

the error was deemed preserved for our review without his objection at trial, or that the error was plain error. *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983). If a defendant fails to object to jury instructions at trial, we review the instruction challenged on appeal under the plain error doctrine. *State v. Odom*, 307 N.C. 655, 300 S.E. 2d 376 (1983). Under the plain error doctrine, our review will be limited to those errors

> "in the exceptional case where, after reviewing the entire record, it can be said that the claimed error is a *'fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done,' or 'where [the error] is grave error which amounts to a denial of a fundamental right of the accused,' or the error has ' "resulted in a miscarriage of justice or in the denial to appellant of a fair trial" ' or where the error is such as to 'seriously affect the fairness, integrity or public reputation of judicial proceedings' . . . ."

*Id.* at 660, 300 S.E. 2d at 378 (quoting *United States v. McCaskill*, 676 F. 2d 995, 1002 (4th Cir. 1982) ), *quoted in State v. Oliver*, 309 N.C. at 334, 307 S.E. 2d at 312.

Defendant has not met his burden of showing plain error. Assuming, for argument's sake, that the transcript is correct and that the trial judge misspoke, we find that any error he made was cured by the instruction which followed. Accordingly, we hold that there is no reasonable ground to conclude that the jury was misled or that defendant was prejudiced. *See State v. Davis*, 290 N.C. 511, 544, 227 S.E. 2d 97, 117 (1976).

## VII.

[17] In his seventh assignment of error, defendant contends that the trial court's alleged error in its peremptory instruction on fourteen nonstatutory mitigating circumstances[14] violated the eighth and fourteenth amendments of the United States Constitution and the parallel provisions of the North Carolina Constitution.

The following instruction is representative of the peremptory instructions given by the court on the nonstatutory mitigating circumstances:

---

14. The trial court, in fact, gave peremptory instructions on only twelve mitigating circumstances.

If you find, unanimously, by a preponderance of the evidence, that the Defendant cooperated with law enforcement officers by making the statement on February 11, 1985 and all the evidence shows that this is true, and if you find that this has mitigating value, you would so indicate by having your foreman write, "Yes" in the space after this mitigating circumstance on the form. If you do not unanimously find this mitigating circumstance by a preponderance of the evidence, you would so indicate by having your foreman write, "No," in the space.

Of the twenty-four potentially mitigating circumstances submitted, the jury found two mitigating circumstances.[15] Neither circumstance was among those nonstatutory factors peremptorily instructed upon by the trial judge.

This Court has said that when all the evidence offered suffices, if true, to establish a controverted fact, and no evidence is offered to the contrary, then the court may give a peremptory instruction. *State v. Johnson*, 298 N.C. 47, 74, 257 S.E. 2d 597, 617 (1979). A peremptory instruction tells the jury that if it finds that the fact exists as all the evidence tends to show, it will answer the question put to it in the manner directed by the trial judge. *Chisholm v. Hall*, 255 N.C. 374, 376, 121 S.E. 2d 726, 728 (1961). However, a peremptory instruction does not deprive the jury of its right to reject the evidence because of a lack of faith in its credibility. *E.g., id., quoted in State v. Johnson*, 298 N.C. at 74, 257 S.E. 2d at 617.

Similarly, we have said that before the jury "finds" a nonstatutory mitigating circumstance, it must make two preliminary determinations: (1) that the evidence supports the existence of the circumstance *and* (2) that the circumstance has mitigating value. *State v. Fullwood*, 323 N.C. 371, 396-97, 373 S.E. 2d 518, 533-34 (1988). Only after the jury has made those two determinations is it proper for the foreman to answer "yes" on the verdict form, and so "find" the mitigating circumstance. *Id.* This two-part requirement for the finding of a *nonstatutory* mitigating circumstance is in contrast to our position in *State v. Kirkley*, 308 N.C. 196, 220-21, 302 S.E. 2d 144, 157-58 (1983), *overruled on other grounds, State v. Shank*, 322 N.C. 243, 367 S.E. 2d 639 (1988), where we

---

15. The jury found that (1) the capital crime was committed while defendant was under the influence of a mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2), and (2) that the capital crime was committed while defendant was under a great deal of stress, N.C.G.S. § 15A-2000(f)(9).

held that on uncontroverted evidence of a *statutory* mitigating circumstance, it is error to instruct the jury that it must determine if the circumstance has mitigating value. Because the legislature has determined that the statutory circumstance has mitigating value, the effect of a peremptory instruction on a *statutory* mitigating circumstance is to remove the question of whether the circumstance has mitigating value. *Id.*

Defendant contends that the peremptory instructions given by the trial court were deficient under *Kirkley* because they failed to remove from the jury's consideration whether the circumstances existed. Defendant asserts that since the trial judge found that the evidence of these mitigating circumstances was uncontroverted, it was error to require the jury both to find that the circumstance existed *and* to find that the circumstance had mitigating value. In light of our recent decision in *Fullwood*, we disagree. Our holding in *Kirkley* concerning the effect of a peremptory instruction on statutory mitigating circumstances does not control the outcome in the case at bar. Our opinion in *Fullwood* on nonstatutory mitigating circumstances governs the decision here.

N.C.G.S. § 15A-2000(f)(9) is the statutory "catchall" provision for mitigating circumstances. *State v. Fullwood*, 323 N.C. at 396, 373 S.E. 2d at 533. It is defined as "[a]ny other circumstance[s] arising from the evidence which the jury deems to have mitigating value," N.C.G.S. § 15A-2000(f)(9) (1988), and includes those circumstances which are not specifically designated in the statute. *State v. Fullwood*, 323 N.C. at 396, 373 S.E. 2d at 533. Since the jury only "finds" a nonstatutory mitigating circumstance if it finds that the evidence supports the existence of the circumstance *and* if it deems it to have mitigating value, *id.*, the trial court did not err here by instructing the jury to do exactly what in *Fullwood* we said it must do.

Defendant also asserts that the court's peremptory instructions are deficient because they misstated the law and, when considered with the recommendation form, could have confused the jury and led it to a misapplication of the law. We disagree. The instruction was a clear and correct statement of the law.

Finally, defendant contends that the sentencer was precluded by this instruction from considering relevant mitigating evidence in violation of the eighth and fourteenth amendments. *Eddings v. Oklahoma*, 455 U.S. 104, 71 L.Ed. 2d 1 (1982). This argument has

no merit. The trial court submitted the twelve circumstances requested by defendant for the jury to consider in mitigation. The eighth and fourteenth amendments do not require that the sentencing jury "find" each circumstance which the court submits as potentially mitigating; our Constitution requires only that the sentencer be permitted to consider any relevant mitigating evidence. *See Raulerson v. Wainwright*, 732 F. 2d 803, 806-07 (11th Cir.), *cert. denied*, 469 U.S. 966, 83 L.Ed. 2d 302 (1984); *State v. Fullwood*, 323 N.C. at 396, 373 S.E. 2d at 533. Clearly, that requirement was met here.

We note that defendant failed to object to these peremptory instructions at trial. For that reason, he has failed to preserve the error for review except under the plain error doctrine. *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983). Since we conclude that defendant has failed to show any error at all, this assignment of error is overruled.

## VIII.

[18, 19] In defendant's eighth assignment of error, he argues that various aspects of the court's instructions individually and in combination impaired the jury's fair consideration of evidence in mitigation of the crime and so violated the eighth and fourteenth amendments. This Court has previously considered and rejected all of defendant's contentions. First, defendant attacks the court's instructions that the jury must recommend a sentence of death if it found that the mitigating circumstances were insufficient to outweigh the aggravating circumstances (issue three) and if it found that the aggravating circumstances were sufficiently substantial to call for the death penalty when considered with the mitigating circumstances (issue four). He contends that it was error to charge the jury that it was its duty to recommend a death sentence if issue four was answered affirmatively. This argument has been rejected repeatedly by this Court. *State v. McDougall*, 308 N.C. 1, 26, 301 S.E. 2d 308, 323-24, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 173 (1983); *State v. Pinch*, 306 N.C. 1, 32-34, 292 S.E. 2d 203, 227 (1982); *State v. Williams*, 305 N.C. 656, 292 S.E. 2d 243, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L.Ed. 2d 1031 (1982). Second, defendant attacks the court's instruction requiring the jury to find each mitigating circumstance unanimously and by a preponderance of the evidence. He contends that the two requirements of unanimity and proof by a

preponderance of the evidence unconstitutionally limited the jury's consideration of mitigating circumstances in issue three,[16] and thus tainted the jury's response on issue four.[17] This Court has held that due process is not violated by requiring the defendant to prove mitigating circumstances by the preponderance of the evidence. *State v. Kirkley*, 308 N.C. at 224, 302 S.E. 2d at 160; *see State v. Brown*, 320 N.C. 179, 216, 358 S.E. 2d 1, 25 (1987). This Court has also rejected defendant's second argument that it was constitutional error to instruct the jury that it must reach unanimous agreement before finding mitigating circumstances under issue two. *State v. McLaughlin*, 323 N.C. 68, 108, 372 S.E. 2d 49, 74-75 (1988).

Accordingly, this assignment of error is overruled.

## IX.

[20] In his ninth assignment of error, defendant contends that the trial court's instructions, taken as a whole and in context, coerced the jury into returning a unanimous sentence.

These are the circumstances that defendant contends resulted in a coerced verdict. After two hours of deliberation as to the sentence, the jury returned to the courtroom to deliver its verdicts. The jury recommended that defendant be sentenced to life imprisonment for the killing of Gail Strickland, and this exchange followed:

CLERK: Is this the unanimous recommendation of the jury as to the victim, Gail Strickland?

FOREMAN: (Shook head negatively.) It's not unanimous, but—I don't believe it had to be unanimous.

COURT: Yes, the recommendation of the jury must be that answers to each of the issues must be unanimous and the recommendation of the jury must be unanimous.

_____

16. Issue three on the recommendation form asks: "Do you unanimously find beyond a reasonable doubt the mitigating circumstance or circumstances found by you is, or are, insufficient to outweigh the aggraviting [sic] circumstance or circumstances found by you?"

17. Issue four on the recommendation form asks: "Do you unanimously find beyond a reasonable doubt that the aggravating circumstance or circumstances found by you is, or are, sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance or circumstances found by you?"

Is the recommendation of the jury not a unanimous recommendation?

FOREMAN: Yes, it is. It was our understanding, your Honor, that if we didn't have a unanimous recommendation of the death penalty, that the alternate penalty would be life in prison.

COURT: Well, it is the jury's responsibility to deliberate to attempt to reach a unanimous recommendation as to punishment in the case. And so, at this point, if the jury's recommendation is not a unanimous recommendation, it would be my responsibility to ask that you retire to the Jury Deliberation Room and to continue your deliberations to see if a unanimous recommendation can be reached.

Thank you very much. If you would return to the jury room.

(3:48 P.M. JURY LEFT COURTROOM.)

The trial court gave only the foregoing instruction and denied defense counsel's motions to instruct that a life sentence would be imposed if the jury were unable to reach a unanimous decision or, alternatively, to impose life sentences in both cases.

About forty-five minutes later, at 4:30 p.m., after the jury had been brought back into the courtroom to be recessed for the weekend, the trial judge a second time asked the foreman if the jurors had been unanimous in their earlier verdict, and the foreman again indicated that the verdict had not been unanimous. The trial judge repeated his instruction that the jurors' sentences must be unanimous; the foreman told the judge that the jurors had been confused over the requirement of unanimity, and all jurors indicated to the judge that the additional instructions had clarified that the sentence had to be unanimous.[18] Then, on defense counsel's re-

---

18.     COURT: Okay, ladies and gentlemen. Before I release you for the day, I need to make a couple of inquiries and to discuss a couple of matters with you.

First, for purpose of clarification, I would inquire of the foreperson of the jury, whether at the time the jury returned to the courtroom with a purported verdict, was the jury unanimous in its "No" answer to Issue Number Four in either of the two cases?

FOREMAN: Could I check?

(PAUSE)

COURT: Okay. Before you answer, let me—Issue Number Four, of course, reads: "Do you unanimously find beyond a reasonable doubt that

quest, the trial court gave an additional instruction on the deliberative process:

> While it is the responsibility of the jury to deliberate together reasonably and with a view to reaching a unanimous recommendation, if that can be done without violence to individual

---

the aggravating circumstance or circumstances found by you is, or are, sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstances found by you?"

The question that I am asking, since on each of the form [sic] at that time, the word, "No," was written, I am inquiring in either case, was it the unanimous determination of the jury—

FOREMAN: (Shaking head negatively.) No, sir.

COURT: —with all twelve jurors agreeing that "No" should be the answer to that question?

FOREMAN: No, sir.

COURT: As to either of the two cases, was it the unanimous recommendation of the jury that life imprisonment be the appropriate punishment?

FOREMAN: No, sir.

COURT: For purposes of clarification, in your—as you proceed in your deliberations, as to Issue Number Four, for the issue in either case to be answered, "Yes," that must be the unanimous—all twelve jurors agreeing—answer to the issues. For it to be answered, "No," all twelve jurors must also agree that that is the appropriate answer.

Now, additionally, for the jury to recommend the death penalty in either case, that must be the unanimous recommendation of the jury. For the jury to recommend life imprisonment, in either case, that must be the unanimous recommendation of the jury.

The jury may not recommend the death penalty in either case unless that is the unanimous recommendation of the jury with all twelve jurors agreeing, consistent with appropriate answers to the issues that would support that recommendation that were also reached unanimously with all twelve jurors agreeing.

The jury may not affirmatively recommend life imprisonment in either case unless that is the unanimous recommendation of the jury, supported by unanimous answers to the issues which, consistent with my instructions, would support an affirmative recommendation of life imprisonment.

I do emphasize that in either case, the jury may not recommend the death penalty without the unanimous recommendation of all of the jurors.

Now, at this point, do you have any questions on behalf of the jury?

FOREMAN: No, sir. I would say that we were a little bit confused about the fact that it had to be unanimous.

judgement, no juror should surrender their [sic] sincere and honest convictions as to the weight or effect of the evidence or the appropriate recommendation in the case simply for the purpose of obtaining unanimity in this case.

Then the jury was recessed for the weekend.

On Monday morning the court reconvened. Defense counsel requested that the court repeat its instruction that no jurors should surrender their conscientious convictions to achieve unanimity, but the trial court declined to do so, stating that it had given the requested instruction immediately before the weekend recess. Defense counsel also renewed their request that, since the jury had not yet returned a verdict, the court order jury deliberations to cease and impose life imprisonment, which the court also declined to do. Instead, the court asked the jury to continue its deliberations and further instructed the jury as follows:

> At such time as you have reached a unanimous recommendation as to punishment in the two cases that you are consider-' ing, you should give a note to that effect to the Bailiff . . . . *At such time as you determine that with reasonable amount of additional deliberations, you will not be able to reach a unanimous recommendation as to punishment,* you should give the Bailiff a note to that effect, and the Bailiff will bring you back into the courtroom.

(Emphasis added.) The jury retired to the jury deliberation room, and in less than an hour returned with a verdict of death in the murder of Crigger Huff and a verdict of life imprisonment in the murder of Gail Strickland.

---

COURT: And I can certainly understand that. At this time, have I adequately clarified that point?

FOREMAN: In my mind, yes, sir.

(Jurors nodding head.)

COURT: Would that be true of all of the jurors? If so, please raise your hand?

(All twelve jurors raise their hand.)

COURT: Okay. Thank you very much.

Okay. It is my understanding, at this point, that it is the request of the jury that we recess for the day and reconvene at ten o'clock Monday morning. Is that correct, Mr. Foreman?

FOREMAN: Yes, sir.

STATE v. HUFF

[325 N.C. 1 (1989)]

Defendant contends that the judge's unanimity instruction immediately following the jury's return of a nonunanimous verdict coerced the return of a unanimous verdict. He contends that that instruction in context told the jurors in effect that they could not return if they were unable to agree, that they could not return with a nonunanimous verdict, and that their only two alternatives were to return with a unanimous life sentence or with a unanimous death sentence.

In *State v. Smith*, 320 N.C. 404, 358 S.E. 2d 329 (1987), we concluded that the judge's unanimity instruction given after the jury asked what would happen if it could not reach a unanimous verdict probably resulted in a coerced verdict.[19] If a jury asks what will happen if it fails to reach a unanimous verdict, the trial court "must inform the jurors that their inability to reach a unanimous verdict should not be their concern but should simply be reported to the court." *Id.* at 422, 358 S.E. 2d at 339. Since the trial court did not so instruct in *Smith*, we concluded that the instructions in the context of the jury's inquiry "probably were misleading and probably resulted in coerced unanimity."

However, in contrast, we believe that the instructions given in the case at bar, taken as a whole, were a correct statement of the law, could not reasonably have been misunderstood by a juror, and did not result in a coerced verdict. Any misunderstanding that might have resulted from the judge's instruction on unanimity

---

19. In *Smith*, the jury asked the trial court this question: "If the jurors' decision is not unanimous, is this automatic life imprisonment or does the jury have to reach a unanimous decision regardless?" The court responded with this instruction:

[A]s I instructed you, the decision that you reach must be unanimous. You may not reach a decision in response to any inquiry propounded to you by a majority vote. All twelve of you must agree unanimously in accord with the instruction I have given you.

You all have a duty to consult with one another and deliberate with a view to reaching an agreement, if it can be done without violence to individual judgments. Each of you must decide these matters for yourselves, but only after impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, each of you should not hesitate to reexamine your own views and change your opinion if it is erroneous, but none of you should surrender your honest convictions as to the weight of effect the evidence [sic], solely because of the opinion of your fellow jurors, or for the mere purpose of returning a recommendation.

*Id.* at 420-21, 358 S.E. 2d at 338.

following the jury's initial return of the verdicts was cured by two subsequent instructions. On Monday morning, the trial court gave the instruction recommended in *Smith*: "If you determine that with a reasonable amount of additional deliberations you will not be able to reach a unanimous recommendation, you should give the Bailiff a note to that effect, and the Bailiff will bring you back into the courtroom." The *Smith* instruction was given before the jury retired to deliberate for the last time and, for that reason, could not have been, as defendant asserts, "too little, too late." The effect of this instruction was to make clear to the jurors that they were free to disagree. For this reason, we conclude that the trial court's instructions did not result in a coerced verdict.

[21] Next, defendant contends that the trial court erred in prohibiting defendant from informing the jury in argument that the capital punishment statute authorizes the trial court to impose a life sentence if the jury is unable to return a unanimous verdict. We find no error.

N.C.G.S. § 84-14 provides that "[i]n jury trials the whole case as well of law as of fact may be argued to the jury." N.C.G.S. § 84-14 (1985). Justice (now Chief Justice) Exum explained that,

> The origins of this provision are obscure but in *State v. Miller*, 75 N.C. 73, 74 (1876) Justice Reade said: "Some twenty five years ago a circuit judge restrained a lawyer from arguing the *law* to the *jury*, suggesting that the argument of the law ought to be addressed to the court, as the jury had to take the law from the court. Umbrage was taken at that, and the Legislature passed an act allowing counsel to argue both the law and the facts to the jury."

*State v. McMorris*, 290 N.C. 286, 287, 225 S.E. 2d 553, 554 (1976).

Subsequent cases construing N.C.G.S. § 84-14 have delineated the scope of the law that counsel may argue to the jury. Counsel may argue only the law that is applicable to the facts in the case; *id.; State v. Crisp*, 244 N.C. 407, 412, 94 S.E. 2d 402, 406 (1956). The penalty prescribed for criminal behavior is part of the law of the case. *State v. McMorris*, 290 N.C. at 287, 225 S.E. 2d at 554. Consequently, the criminal defendant may inform the jury in argument of the statutory punishment provided for the crime for which he is being tried. *Id.* at 287-88, 225 S.E. 2d at 554.

STATE v. HUFF

[325 N.C. 1 (1989)]

Informing the jury of the statutory punishment for the crime in serious felony cases "serves the salutary purpose of impressing upon the jury the gravity of its duty." *Id.* at 288, 225 S.E. 2d at 554. If imprisonment is an authorized penalty, advising the jury that it is a possible consequence of conviction encourages the jury to "give the matter its close attention and to decide it only after due and careful consideration." *Id.* A trial court's failure to permit defense counsel to advise the jury through argument of the statutory provision fixing the punishment for the offense charged is error. *Id.; accord, State v. Irick,* 291 N.C. 480, 504, 231 S.E. 2d 833, 848 (1977).

The statute fixing the penalty for capital crimes, N.C.G.S. § 15A-2000 (1988), authorizes the sentencing jury in capital trials to return one of two sentencing recommendations: either death or life imprisonment. The trial judge's duty is to impose the recommended sentence. *Id.* N.C.G.S. § 15A-2000 also authorizes defense counsel to argue at the sentencing phase of the capital trial the two authorized penalties of life imprisonment and death. N.C.G.S. § 15A-2000(a)(4) provides: "The State and the defendant or his counsel shall be permitted to present argument for or against sentence of death."

Defendant contends that this Court in *State v. McMorris,* 290 N.C. 286, 225 S.E. 2d 553, stated that counsel may in his argument to the jury read *any* statutory provision fixing punishment for the offense charged. Defendant is mistaken. The language in *State v. Britt,* 285 N.C. 256, 273, 204 S.E. 2d 817, 829 (1974), quoted in *State v. McMorris,* 290 N.C. at 288, 225 S.E. 2d at 555, is not broad and sweeping, but rather narrow and concrete. In *Britt,* we stated that "[c]ounsel may, in his argument to the jury, in any case, read or state to the jury a statute or other rule of law *relevant to such case,* including *the* statutory provision fixing the punishment for the offense charged." *Id.* (emphasis added) (citations omitted). In the instant case, the trial court permitted defense counsel to do what we required in *Britt*: to state to the jury the statutory penalty provision relevant to the jury's task in a capital sentencing proceeding — the return of a death sentence or a sentence of life imprisonment. The trial court properly prohibited defense counsel from informing the jury of the default provisions of the capital sentencing statute. The default provision authorizing the trial court to impose a life sentence if the jury cannot reach unanimous agreement on the penalty is not relevant to the jury's

task, and the trial court is not required to allow defense counsel to argue it to the jury.

This construction of the scope of jury argument under N.C.G.S. § 84-14 is theoretically consistent with our position that the courts should not instruct that N.C.G.S. § 15A-2000(b) authorizes the trial court to impose a life sentence if the jury cannot reach unanimous agreement on the proper sentence. *State v. Smith*, 320 N.C. 404, 421, 358 S.E. 2d 329, 338-39 (1987); *State v. Young*, 312 N.C. 669, 685, 325 S.E. 2d 181, 191 (1985); *State v. Moose*, 310 N.C. 482, 502, 313 S.E. 2d 507, 520 (1984); *State v. Williams*, 308 N.C. 47, 73, 301 S.E. 2d 335, 351-52, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L.Ed. 2d 704 (1983); *State v. Brown*, 306 N.C. 151, 184-85, 293 S.E. 2d 569, 590 (1982); *State v. Smith*, 305 N.C. 691, 710, 292 S.E. 2d 264, 276, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982); *State v. Hutchins*, 303 N.C. 321, 353, 279 S.E. 2d 788, 807 (1981); *State v. Johnson*, 298 N.C. 355, 369-70, 259 S.E. 2d 752, 761-62 (1979). In declining to require the trial court to instruct on its authority to impose the life sentence, we have asked what effect the instruction would have: if it would be helpful to the jury in completing its task? Or if it would create problems that would interfere with the jury's task? In answering these questions, we have concluded that the instruction would not help the jury to complete its task, which is to make a sentencing recommendation based upon its consideration of the aggravating and mitigating circumstance(s) it finds to exist. *State v. Johnson*, 298 N.C. at 370, 259 S.E. 2d at 762. We have also concluded that the instruction would create a problem by permitting the jury to avoid coming to the sentencing recommendation. *Id.* The giving of the instruction would "be tantamount to an open invitation for the jury to avoid its responsibility and to disagree." *State v. Smith*, 305 N.C. at 710, 292 S.E. 2d at 276 (quoting *Justus v. Commonwealth*, 220 Va. 971, 979, 266 S.E. 2d 87, 92 (1980)), *quoted in State v. Smith*, 320 N.C. at 421-22, 358 S.E. 2d at 339.

Accordingly, we have held that if the jury inquires about nonunanimity, the jury is to be instructed that if it is unable to come to an unanimous sentencing decision, it is to report that to the trial court,[20] and the trial court is not to instruct it of

---

20. In his brief, defendant urges the Court to overrule its decision in *Smith*. He maintains that the confusion attending this jury's initial nonunanimous verdict would be eliminated by instructing the jury of the consequences of nonunanimity

the consequences of nonunanimity. *State v. Smith*, 320 N.C. at 422, 358 S.E. 2d at 339.

The case before us represents the intersection of these two legal principles, expressed in N.C.G.S. § 84-14 and in *State v. Johnson*, 298 N.C. at 370, 259 S.E. 2d at 762, and its progeny. Our goal here is to inform the capital sentencing jury of the law, to encourage the jury to take responsibility for its statutory task, to apply the law to the facts of the case, but to do so without diverting the jury from the task with uncertain possibilities affecting the character of the punishment or its duration. Refusing to permit defense counsel to argue the consequences of nonunanimity allows the jury to focus on its grave task without inviting it to escape its responsibilities. Therefore, consistent with those goals, with N.C.G.S. § 84-14 and the cases construing it, with the capital punishment statute, and with *Johnson* and its progeny, we hold that defense counsel is not entitled to argue that the trial court will impose a life sentence if the jury cannot reach a unanimous decision, and that the trial court properly refused to permit counsel to argue the consequences of nonunanimity.

[22] Finally, defendant contends that the trial court violated N.C.G.S. § 15A-2000(b) by failing to impose a life sentence in the killing of Crigger Huff when the jury returned with its nonunanimous verdict after two hours deliberation, or after forty-five minutes additional deliberation, when the trial was reconvened on Monday morning. N.C.G.S. § 15A-2000(b) in pertinent part provides: "If the jury cannot, within a reasonable time, unanimously agree to its sentence recommendation, the judge shall impose a sentence of life imprisonment." N.C.G.S. § 15A-2000(b) (1988). We find no violation of N.C.G.S. § 15A-2000(b) in this case. What constitutes a reasonable time for jury deliberation in the sentencing stage is left to the trial judge's discretion, *e.g., State v. McLaughlin*, 323 N.C. 68, 103, 372 S.E. 2d 49, 72 (1988), since the trial judge is in the best position to determine how much time is reasonable under the facts of a specific case. *State v. Kirkley*, 308 N.C. 196, 221, 302 S.E. 2d 144, 159. Cases vary in the number of aggravating and mitigating circumstances submitted to the jury for its consideration. *Id.* This Court held in *McLaughlin* that the trial court

---

on defendant's request. Aside from that unsupported statement, defendant has advanced no new reasons to warrant reversal of our decision not to so instruct, and we decline to do so.

did not err in not imposing life sentences after the jury had deliberated seven hours on three separate cases. *State v. McLaughlin*, 323 N.C. at 103-04, 372 S.E. 2d at 72. The *McLaughlin* jury considered two aggravating circumstances and six mitigating circumstances in the first case, four aggravating and six mitigating circumstances in the second case, three aggravating and six mitigating circumstances in the third case, for a total of seven aggravating circumstances and eighteen mitigating circumstances. *Id.* In the case at bar, the jury considered two charges. Two aggravating circumstances and twenty-four mitigating circumstances were submitted in the killing of Crigger Huff, and one aggravating circumstance and twenty-four mitigating circumstances in the killing of Gail Strickland, for a total of three aggravating circumstances and forty-eight mitigating circumstances. At the time the jury returned with its nonunanimous verdict, it had deliberated for less than two hours, and at the time the jury reconvened on Monday morning, it had deliberated for less than two hours and forty-five minutes. Under these circumstances, we do not believe the trial court abused its discretion in refusing to dismiss the jury and to impose a life sentence on either occasion.

For the foregoing reasons, defendant's ninth assignment of error is overruled.

X.

[23] In defendant's tenth assignment of error, he contends that the trial court erred in permitting the prosecutor to make prejudicial comments about defendant, the crime, and the community during the prosecutor's penalty phase argument to the jury. Defendant objected on several occasions when the prosecutor urged the jury to speak for the community. The following excerpt is illustrative:

Today, you speak for the people of North Carolina. You are the moral conscience of our community. By your verdict in [the guilt-innocence] phase . . . , you have indicated that you are completely satisfied, totally convinced, that this Defendant is guilty of first degree murder, and today, you sent out a message —

MR. BRITT: Objection.

COURT: Overruled.

MR. VANSTORY: — and the State contends that it should be a thunderous message —

MR. BRITT: Objection.

COURT: Overruled.

MR. VANSTORY: — to every person within earshot, "No, Randy Huff, we will not tolerate what you did. We think it is bad. We want the world to know it. We think you are deserving of the ultimate penalty provided by law."

Defendant maintains that the prosecutor argued by implication that the jury had an obligation to the community and to the state to return a sentence of death.

We have recently rejected a similar contention in *State v. Brown*, 320 N.C. 179, 358 S.E. 2d 1, *cert. denied*, 484 U.S. 970, 98 L.Ed. 2d 406 (1987), wherein the defendant excepted to portions of the jury argument in which the prosecutor told the jury that he spoke for the citizens of this state. We concluded that such an argument "does no more than remind the jurors that 'the buck stops here' and that for purposes of defendant's trial, they are the voice and conscience of the community." *Id.* at 204, 358 S.E. 2d at 18 (quoting *State v. Scott*, 314 N.C. 309, 311-12, 333 S.E. 2d 296, 297-98 (1985)). Here, the prosecutor simply reminded defendant's jury that by its verdict in the guilt-innocence phase and its concomitant punishment decision, it was the voice and conscience of the community. A prosecutor may properly argue that the jury should return a sentence of death in the penalty phase of a capital trial. This assignment of error is overruled.

## XI.

[24] In defendant's eleventh assignment of error, he contends that the trial court erred in permitting the prosecutor to state the law with regard to mitigating circumstances incorrectly during his closing argument to the jury. The prosecutor defined a mitigating circumstance as evidence that lessens or reduces the severity of the crime. Defendant asserts that this statement directs the jury that in order to find that certain evidence had mitigating value, it would have to find that the evidence was sufficient to reduce the crime of first-degree murder to some lesser included offense. This assertion is without merit. The prosecutor's definition was merely an acceptable shorthand statement of the charge on miti-

gating circumstances that the trial court subsequently gave to the jury. We have already concluded that no plain error exists in that portion of the charge. Moreover, the prosecutor could properly argue that the weight of any mitigating circumstance was for the jury's determination. *State v. Craig*, 308 N.C. 446, 302 S.E. 2d 740, *cert. denied*, 464 U.S. 908, 78 L.Ed. 2d 247 (1983).

[25] Defendant also takes issue with the prosecutor's statement that the statutory mitigating circumstances submitted in this case had "been passed into law by the legislature," so that the legislature had therefore provided for their consideration by the jury, and that the nonstatutory mitigating circumstances were "created and urged" upon the jury by defense counsel. Defendant argues that the implication in this statement is that the nonstatutory mitigating circumstances submitted to the jury had not been provided for by the legislature and were thus unworthy of the jury's consideration. Defendant's argument is meritless. Having perused the transcript, we perceive no such implication in the prosecutor's statements. Defendant further asserts that the trial court put its "stamp of approval" on the prosecutor's statements by using similar language in its instructions to the jury. This assertion is equally meritless. With regard to mitigating circumstances, the trial court's charge tracked the pattern jury instructions in force at the time of trial. N.C.P.I.—Crim. 150.10 (Replacement May 1987). We find nothing erroneous in the instructions that the trial court gave as to mitigating circumstances. *See State v. Irwin*, 304 N.C. 93, 282 S.E. 2d 439 (1981). Although the trial court differentiated between the statutory and nonstatutory mitigating circumstances, it did so in a purely factual manner. Furthermore, while instructing on the twenty-four mitigating circumstances, the trial court stated in twelve instances that "all the evidence shows that [the particular nonstatutory mitigating circumstance] is true." There is no implication whatsoever in the trial court's instructions that the nonstatutory mitigating circumstances were unworthy of the jury's consideration. This assignment of error is overruled.

## XII.

[26] Defendant brings forward one further argument which he erroneously briefed as a preservation issue: that the trial court erred in denying his motion for a mistrial during the sentencing phase of his trial. The prosecutor called defendant's former girlfriend, who testified that defendant had assaulted her, and later

had shot at her while she was in her car. The girlfriend also testified that she carried threatening letters from defendant in her car. The trial court sustained defendant's objection to this latter testimony. Thereafter, the prosecutor marked for identification a card with the word "killed" inscribed upon it in black and red ink to approximate dripping blood. The prosecutor then asked the girlfriend how she came to receive the card, to which she replied that it had been placed in her mailbox while defendant was in jail awaiting trial. Defendant objected, and his motion to strike was allowed. The trial court instructed the jury not to consider this evidence. Defendant then moved for the mistrial that is the basis of this assignment of error. While conceding that the trial judge did not abuse his discretion in denying the motion for mistrial, defendant now contends that the prejudicial effect of the evidence could not be corrected by the trial court's instruction to the jury and further contends that in this capital-sentencing proceeding, the mistrial should have been granted. We disagree.

The girlfriend's improper testimony was cut off in mid-sentence by defendant's objection. The objection was sustained. Defendant asserts that the prosecutor must have known that the card could not be tied to defendant since he was in jail when it was placed in the girlfriend's mailbox, but he has failed to show how he was prejudiced. The trial court immediately sustained defendant's objection, granted the motion to strike and appropriately instructed the jury. It is not error for a trial court to deny a defendant's motion for mistrial for improper questioning where the trial court has sustained the defendant's objections and instructed the jury not to consider the question. *State v. Bright*, 301 N.C. 243, 271 S.E. 2d 368 (1980).

## PRESERVATION ISSUES

[27] Defendant brings forward six issues for preservation purposes. First, defendant contends that the trial court erred in denying his motion for separate juries for the guilt-innocence and penalty phases of his trial and his motion to prohibit the State from "death qualifying" the jurors. This Court has previously resolved these contentions contrary to defendant's position. *State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (1981), *cert. denied*, 463 U.S. 1213, 77 L.Ed. 2d 1398, *reh'g denied*, 463 U.S. 1249, 77 L.Ed. 2d 1456 (1983); *State v. Avery*, 299 N.C. 126, 261 S.E. 2d 803 (1980); *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979), *cert. denied*, 446 U.S. 941, 64 L.Ed. 2d 796 (1980).

[28]  Second, defendant contends that the trial court erred in deny-
ing his motion to declare the North Carolina law on insanity
unconstitutional. This issue has previously been decided against
defendant. *State v. Mancuso*, 321 N.C. 464, 364 S.E. 2d 359 (1988);
*State v. Evangelista*, 319 N.C. 152, 353 S.E. 2d 375 (1987).

[29]  Third, defendant contends that the trial court erred in deny-
ing his motion for a bifurcated trial on the issues of insanity and
guilt-innocence. This Court has previously decided this issue adverse-
ly to defendant. *State v. Mancuso*, 321 N.C. 464, 364 S.E. 2d 359.

[30]  Fourth, defendant contends that the trial court erroneously
excused jurors for cause because of their opposition to capital punish-
ment. This argument was decided against defendant's position in
*State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983).

[31]  Fifth, defendant contends that the North Carolina death penalty
statute, N.C.G.S. § 15A-2000, is unconstitutional. We have previously
considered this contention and have decided it adversely to de-
fendant. *State v. Gladden*, 315 N.C. 398, 340 S.E. 2d 673, *cert.
denied*, 479 U.S. 871, 93 L.Ed. 2d 166 (1986); *State v. Rook*, 304
N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied*, 455 U.S. 1038, 72
L.Ed. 2d 155 (1982).

[32]  Sixth, defendant contends that the trial court erred in deny-
ing his motion for a bill of particulars from the State disclosing
the aggravating factors upon which it proposed to rely in seeking
the death penalty. This contention has been previously rejected.
*State v. Holden*, 321 N.C. 125, 362 S.E. 2d 513 (1987), *cert. denied*,
--- U.S. ---, 100 L.Ed. 2d 935 (1988).

In summary, all of these contentions have been decided con-
trary to defendant's position. We decline to readdress them here.
These assignments of error are overruled.

STATUTORY REVIEW

Having found no prejudicial error in the guilt-innocence phase
or the sentencing phase of defendant's trial, we now turn to our
statutorily mandated review of the judgment and sentence of death
imposed upon defendant. N.C.G.S. § 15A-2000(d)(2) (1988). In doing
so, we must determine whether the record supports the jury's
findings of the aggravating circumstances upon which the sentenc-
ing court based its sentence of death, whether the sentence of
death was imposed under the influence of passion, prejudice, or any

other arbitrary factor, and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *Id.; State v. Huffstetler*, 312 N.C. 92, 117, 322 S.E. 2d 110, 126 (1984), *cert. denied*, 471 U.S. 1009, 85 L.Ed. 2d 169 (1985).

We have thoroughly reviewed the record, the transcript and the briefs in this case. We have already determined that the record supports the submission of the aggravating circumstances that defendant had previously been convicted of a felony of violence to the person, N.C.G.S. § 15A-2000(e)(3) (1988), and that the murder of defendant's son was especially heinous, atrocious or cruel, N.C.G.S. § 15A-2000(e)(9) (1988). Further, the record reveals no indication that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

[33] We finally consider, therefore, whether the death sentence imposed in this case is proportionate to the penalty imposed in similar cases. We have defined this review as follows:

> In essence, our task on proportionality review is to compare the case at bar with other cases in the pool which are roughly similar with regard to the crime and the defendant, such as, for example, the manner in which the crime was committed and defendant's character, background, and physical and mental condition. If, after making such a comparison, we find that juries have consistently been returning death sentences in the similar cases, we will have a strong basis for concluding that a death sentence in the case under review is not excessive or disproportionate. On the other hand, if we find that juries have consistently been returning life sentences in the similar cases, we will have a strong basis for concluding that a death sentence in the case under review is excessive or disproportionate.

*State v. Lawson*, 310 N.C. 632, 648, 314 S.E. 2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L.Ed. 2d 267 (1985).

In conducting the proportionality review, this Court uses as its pool of similar cases all cases tried as capital cases since 1 June 1977 in which a jury has recommended a death or a life sentence or in which a life sentence was imposed pursuant to N.C.G.S. § 15A-2000(b). *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177, *reh'g denied*, 464 U.S.

1004, 78 L.Ed. 2d 704 (1983). The pool consists of the cases in which this Court has found no prejudicial error in either the guilt phase or the sentencing phase. *State v. Stokes*, 319 N.C. 1, 352 S.E. 2d 653 (1987). In making the necessary comparison:

> First, this crime and this defendant are compared with the crime and the defendant in cases with similar facts, including cases in which the same aggravating circumstance was found. Second, this case is compared to cases in which this Court has affirmed a sentence of death in order to determine whether this case "rise[s] to the level of those murders in which we have approved the death sentence upon proportionality review." *State v. Bondurant*, 309 N.C. 674, 693, 309 S.E. 2d 170, 182 (1983), quoting *State v. Jackson*, 309 N.C. 26, 46, 305 S.E. 2d 703, 717 (1983).

*State v. Brown*, 320 N.C. 179, 220, 358 S.E. 2d 1, 28 (1987).

In the case sub judice, defendant was found guilty of the first-degree murder of his infant son and the first-degree murder of his mother-in-law. The sentence of death recommended by the jury for the murder of defendant's son was based on the finding of two aggravating circumstances: (1) defendant had previously been convicted of a felony of violence to the person, N.C.G.S. § 15A-2000(e)(3); and (2) the murder of defendant's infant son was especially heinous, atrocious or cruel, N.C.G.S. § 15A-2000(e)(9). Of the twenty-four mitigating circumstances submitted to the jury, two were found: (1) the capital felony was committed while defendant was under the influence of a mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); and (2) the nonstatutory mitigating circumstance that defendant was under a great deal of stress at the time of the offenses.

This Court has upheld the death sentence in cases where the juries have found that the murders were especially heinous, atrocious, or cruel. In *State v. Spruill*, 320 N.C. 688, 360 S.E. 2d 667 (1987), *cert. denied*, --- U.S. ---, 100 L.Ed. 2d 934 (1988), for example, the defendant was convicted of the first-degree murder of his former girlfriend. The evidence showed that the defendant cut the victim's throat so that she drowned in her own blood. Here, by comparison, the evidence established that the victim died from suffocation after being buried alive. *See State v. Huffstetler*, 312 N.C. 92, 322 S.E. 2d 110 (1984), *cert. denied*, 471 U.S. 1009, 85 L.Ed. 2d 169 (1985) (jury found this aggravating circumstance where defendant repeat-

edly hit his mother-in-law over the head with an iron pan); *State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied*, 455 U.S. 1038, 72 L.Ed. 2d 155 (1982) (defendant beat victim with tire tool, cut her with knife, raped her, ran over her body with a car, and left her to die in a lonely field); *State v. Craig*, 308 N.C. 446, 302 S.E. 2d 740, *cert. denied*, 464 U.S. 908, 78 L.Ed. 2d 247 (1983) (brutal slaying of heavily intoxicated woman who was utterly defenseless).

Moreover, the pool includes affirmed death penalty cases in which the jury found as an aggravating circumstance that the defendant had previously been convicted of a felony involving the use of violence to another person. *See State v. Brown*, 320 N.C. 179, 358 S.E. 2d 1, *cert. denied*, 484 U.S. 970, 98 L.Ed. 2d 406 (1987) (this aggravating circumstance supported death sentence where victim shot in his home); *State v. Robbins*, 319 N.C. 465, 356 S.E. 2d 279, *cert. denied*, 484 U.S. 918, 98 L.Ed. 2d 226 (1987) (multiple killings); *State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (1981), *cert. denied*, 463 U.S. 1213, 77 L.Ed. 2d 1398, *reh'g denied*, 463 U.S. 1249, 77 L.Ed. 2d 1456 (1983) (female victim robbed by defendant while on her way to work).

Although our research has revealed no cases already in the pool in which the victim was buried alive, certain comparisons in this case pertaining to the nature and quality of the murder of defendant's infant son may be made with other cases in the pool. In *State v. Brown*, 306 N.C. 151, 293 S.E. 2d 569, *cert. denied*, 459 U.S. 1080, 74 L.Ed. 2d 642 (1982), for example, a nine-year-old child and her young mother were brutally stabbed and slashed to death. The bodies were extensively mutilated. The pathological evidence showed that many of the wounds were inflicted before death. These murders were pitiless and apparently motiveless. In *State v. Huffstetler*, 312 N.C. 92, 322 S.E. 2d 110, the victim was battered to death by a prolonged series of blows to the head with an iron pan. This Court characterized the murder as a senseless, unprovoked assault by an adult male on a sixty-five-year-old female in her home. Although the bloody violence in *Brown* and *Huffstetler* is not present in the case before us, the evidence nevertheless establishes that defendant murdered his helpless, defenseless infant son without pity, condemning him to die by suffocation by burying him alive. Defendant himself described how he took his child to the place where he had dug a hole for the grave. After allowing the child to play in the leaves under a nearby tree, defendant

picked him up and "told him good-bye." The child was looking at defendant. Defendant laid the child in the hole and the child began to play with the dirt and cut roots. Defendant did not look at his infant son again; he shoveled the earth in on the child and placed the sod on top. He threw the shovel away and left in his car. The nature and quality of defendant's murder of his infant son is such that we conclude that this is not a proper case in which to exercise our statutory authority to set aside the sentence of death.

Finally, as we recently stated:

> This Court has found the death sentence disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E. 2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E. 2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E. 2d 713 (1986), *overruled on other grounds*, *State v. Vandiver*, 321 N.C. 570, 364 S.E. 2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E. 2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E. 2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E. 2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E. 2d 703 (1983). In none of these cases was the defendant convicted of more than one murder.

*State v. McNeil*, 324 N.C. 33, 59-60, 375 S.E. 2d 909, 925 (1988).

The case of *State v. Allen*, 322 N.C. 176, 367 S.E. 2d 626 (1988), like the case before us, involved the killing of an infant child by his parent, and the defendant received a life sentence. Unlike *Allen*, this case involves two first-degree murders.

Our comparison of this defendant and this crime with defendants and crimes in cases with similar facts compels this Court to conclude that the death sentence imposed upon his conviction of the first-degree murder of his infant son is not excessive or disproportionate and must be affirmed.

We hold that defendant received a fair trial and sentencing proceeding, free from prejudicial error. The sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Defendant's death sentence is not disproportionate to the penalty imposed in similar cases. Accordingly, in both the guilt-innocence and sentencing phases of defendant's trial, we find

No error.

Chief Justice EXUM concurring.

I concur with the majority's treatment of all issues in the guilt and sentencing phases of this trial.

If in the sentencing phase the Court were addressing for the first time the mitigating circumstance unanimity instruction issue, I would agree with defendant's position that these instructions violate the Eighth Amendment to the federal constitution as that amendment was interpreted in *Mills v. Maryland*, 486 U.S. ---, 100 L.Ed. 2d 384 (1988), for the reasons stated in my dissenting opinions in *State v. McKoy*, 323 N.C. 1, 372 S.E. 2d 12 (1988), *cert. granted*, --- U.S. ---, 103 L.Ed. 2d 180 (1989), and *State v. Allen*, 323 N.C. 208, 372 S.E. 2d 855 (1988). The majority's position on this issue is, as a result of the Court's decisions in *McKoy* and *Allen*, the law of this state to which I am now bound. For this reason I concur with the majority's treatment of this issue.

Justice WEBB concurring.

I concur in the result reached but I disagree with the majority reasoning that it was error for the court to allow the defendant to be removed from the courtroom during one stage of the trial. The majority has held this was harmless error. I would hold that it was not error.

I believe it should be obvious that a defendant in a capital case or any other case cannot be allowed to stop a trial by the disruptive tactics the defendant used in this case. I believe it would be better to place the decision on this actual reason than rationalizing it on some other ground.

I believe we should hold there is an exception to the rule that a defendant in a capital case cannot waive his right to be present at all stages of the proceedings. This exception should be that if a defendant becomes so disruptive that the trial cannot continue the defendant may be removed from the courtroom. Applying this exception to the case, there would be no error.

Justice FRYE dissenting as to sentence.

I concur in the result reached as to the guilt phase of the trial but find it necessary to dissent as to the result reached regarding the sentencing phase. As to the sentencing phase, defendant contended that the two requirements of unanimity and proof of miti-

gating circumstances by a preponderance of the evidence unconstitutionally limited the jury's consideration of mitigating circumstances in Issue Three, and thus tainted the jury's response on Issue Four. The majority rejects defendant's argument regarding unanimity on the authority of *State v. McLaughlin*, 323 N.C. 68, 108, 372 S.E. 2d 49, 74-75 (1988). For the reasons stated in my dissenting opinion in *McLaughlin*, I continue to believe that the United States Supreme Court's decision in *Mills v. Maryland*, 486 U.S. ---, 100 L.Ed. 2d 384 (1988), is applicable to the North Carolina death sentencing procedure. I also note that the United States Supreme Court has granted certiorari in the case relied on by the majority of this Court in *McLaughlin. State v. McKoy*, 323 N.C. 1, 372 S.E. 2d 12 (1988), *cert. granted*, --- U.S. ---, 103 L.Ed. 2d 180 (1989).